IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

MAGGIE M. CLEMMONS                          )
                                            )
                Plaintiff,                  )
                                            )
v.                                          )    Civil Action No.: 3:25cv724
                                            )
CITY OF RICHMOND SCHOOL BOARD,              )
SERVE:        Clerk of the School Board     )
              301 N. Ninth Street, 17th Floor  )
              Richmond, Virginia 23219       )
                                            )
MATTHEW PERCIVAL,                           )
SERVE:        City of Richmond School Board )
              301 N. Ninth Street, 17th Floor  )
              Richmond, Virginia 23219       )
                                            )
KATHRYN RICARD                              )
SERVE:        City of Richmond School Board )
              301 N. Ninth Street, 17th Floor  )
              Richmond, Virginia 23219       )
                                            )
ALI FARUK                                   )
SERVE:        City of Richmond School Board )
              301 N. Ninth Street, 17th Floor  )
              Richmond, Virginia 23219       )
                                            )
WESLEY HEDGEPETH                            )
SERVE:        City of Richmond School Board )
              301 N. Ninth Street, 17th Floor  )
              Richmond, Virginia 23219       )
                                            )
STEPHANIE RIZZI                             )
SERVE:        City of Richmond School Board )
              301 N. Ninth Street, 17th Floor  )
              Richmond, Virginia 23219       )
                                            )
DR. SHONDA HARRIS-MUHAMMED                  )
SERVE:        City of Richmond School Board )
              301 N. Ninth Street, 17th Floor  )
              Richmond, Virginia 23219       )
                                            )

```
CHERYL BURKE                                          )
SERVE:      City of Richmond School Board            )
            301 N. Ninth Street, 17th Floor          )
            Richmond, Virginia 23219                 )
                                                     )
EMMETT JAFARI                                        )
SERVE:      City of Richmond School Board            )
            301 N. Ninth Street, 17th Floor          )
            Richmond, Virginia 23219                 )
                                                     )
SHAVONDA DIXON-FERNANDEZ                             )
SERVE:      City of Richmond School Board            )
            301 N. Ninth Street, 17th Floor          )
            Richmond, Virginia 23219                 )
                                                     )
and                                                  )
                                                     )
JASON KAMRAS                                         )
SERVE:      City of Richmond School Board            )
            301 N. Ninth Street, 17th Floor          )
            Richmond, Virginia 23219                 )
                                                     )
            Defendants.                              )
```

## COMPLAINT

Maggie M. Clemmons, by counsel, hereby states as follows as her Complaint against the following defendants: City of Richmond School Board d/b/a City of Richmond Public Schools (the "School Board" or "RPS"), Matthew Percival, in his individual capacity, Kathryn Ricard, in her individual capacity, Ali Faruk, in his individual capacity, Wesley Hedgepeth, in his individual capacity, Stephanie Rizzi, in her individual capacity, Dr. Shonda Harris-Muhammed, in her individual capacity, Cheryl Burke, in her individual capacity, Emmett Jafari, in his individual capacity, Shavonda Dixon-Fernandez, in her individual capacity, and Jason Kamras, in his individual capacity (collectively, "Defendants").

**NATURE OF ACTION**

1.      This case is about a smear campaign. In early 2025, a group of disgruntled Richmond Public Schools ("RPS") employees set out to destroy the reputation of Clemmons, then serving as RPS Talent Director. They did not confine their grievances to internal channels; instead, they coordinated with one another, informed the School Board and Superintendent Jason Kamras of their intentions, and provided in writing, the false and inflammatory accusations they planned to air publicly during the February 4, 2025 School Board meeting. Those accusations included, but were not limited to::

- "Maggie ***intentionally worked at breaking the team down*** by refusing to give us the help we needed."

- "Like so many of my colleagues in the Talent Department, I have been experiencing ***unlawful conduct, mistreatment, bullying*** whenever I have to interact with the Chief of Talent, Maggie Clemmons"

- "I have recently filed a grievance in response to her extremely problematic and ***unethical behaviors***"

- "She has ***hired friends and neighbors***"

- "Mrs. Clemmons ***mocked my accent***"

- ". . . ever since Maggie has been hired, she has created a ***toxic and hostile work environment*** and has ***violated employee rights***.  She is ***unprofessional, racist, ageist, a liar, and an abuser of power who is out of control****.*"

- "Maggie Clemmons has ***no respect for us as professionals***, or the work that we do"

- "I often feel used up and forgotten, ***like a slave on a plantation***."

These comments were false, malicious, and defamatory on their face. They were designed to inflict maximum reputational harm on Clemmons in a public forum, and they succeeded.

2.      Neither the School Board nor Kamras did anything to stop these employees from openly and publicly airing their false and defamatory grievances about Clemmons. Just the opposite, prior to the February 4, 2025 meeting, the School Board, as a unit, specifically decided it would allow the employees to publicly trash Clemmons.

3.      The employees' false and defamatory statements were widely reported in the media following the February 4, 2025 meeting.[1] So too was the fact that the School Board, just two days after the meeting, placed Clemmons on administrative leave.[2]  The inextricably connected nature of these two events created the clear public impression that the false accusations about Clemmons were true.

4.      Even worse, fresh on the heels of the February spectacle, *and while Clemmons was still on administrative leave*, the School Board publicly posted her position as being "open."  It also publicly said she would "not be returning to the role."[3]  In other words, RPS told the entire Richmond-area public (and beyond) that it was terminating Clemmons because it thought the prior false allegations about her were true.[4]

5.      All of the above actions, as more fully explained herein, are unlawful.  The School Board and Kamras knowingly and willfully allowed Clemmons to be viciously defamed without any ability to defend herself and then, without any due process, RPS told the entire world that it

---

[1] https://www.wric.com/news/local-news/richmond/rps-toxic-work-environment-allegations/ (visited on September 5, 2025).

[2] https://www.wric.com/news/local-news/richmond/richmond-public-schools-place-chief-talent-officer-on-leave-after-toxic-work-environment-allegations/ (visited on September 5, 2025).

[3] https://www.wric.com/news/local-news/richmond/rps-chief-talent-officer-will-not-be-returning-to-the-role/ (visited on September 5, 2025).

[4] The media immediately connected the dots and understood RPS's termination action to be tied back to the defamatory statements .  https://www.richmonder.org/rps-posts-job-opening-for-a-chief-talent-officer-months-after-investigation-into-clemmons/ (visited on September 5, 2025).

was terminating her *because* the defamatory accusations about her were true. Clemmons now files this action for (i) denial of her liberty interest rights in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution; and (iii) aiding and abetting defamation, to vindicate her rights and to restore her good name.

### JURISDICTION AND VENUE

6.     This Court has federal subject matter jurisdiction over the federal claim in this case pursuant to 28 U.S.C. § 1331. It has pendent and supplemental jurisdiction over the state law claim in this case pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claims occurred.

### PARTIES

8.     Clemmons is a lifelong educator and public servant.  With over 20 years' experience in both rural and urban school divisions and private schools, she started her career as a classroom teacher, moved into a leadership role as a building level administrator, and then became part of a large school division's central office staff as special assistant to the superintendent. She spent six years at the Virginia Department of Education, first serving as the Coordinator of Organizational Development and Advancement, and then was the Director of Licensure and School Leadership.  In addition, she previously worked for the House of Delegates as the Director of Legislative Education and Development.  Clemmons holds a B.A. in history from the University of Virginia's College at Wise and a Master's Degree in Educational Leadership from Virginia Commonwealth University.

9.      Defendant City of Richmond School Board is a school board organized under the laws of Virginia.  At all relevant times herein, the School Board was Clemmons' employer.

10.      Defendant Matthew Percival is, and at all relevant times herein has been, a member of the School Board. He is sued in his individual capacity.

11.      Defendant Kathryn Ricard is, and at all relevant times herein has been, a member of the School Board. She is sued in her individual capacity.

12.      Defendant Ali Faruk is, and at all relevant times herein has been, a member of the School Board. He is sued in his individual capacity.

13.      Defendant Wesley Hedgepeth is, and at all relevant times herein has been, a member of the School Board. He is sued in his individual capacity.

14.      Defendant Stephanie Rizzi is, and at all relevant times herein has been, a member of the School Board. She is sued in her individual capacity.

15.      Defendant Dr. Shonda Harris-Muhammed is, and at all relevant times herein has been, a member of the School Board. She is sued in her individual capacity.

16.      Defendant Cheryl Burke is, and at all relevant times herein has been, a member of the School Board. She is sued in her individual capacity.

17.      Defendant Emmett Jafari is, and at all relevant times herein has been, a member of the School Board. He is sued in his individual capacity.

18.      Defendant Shavonda Dixon-Fernandez is, and at all relevant times herein has been, a member and Chair of the School Board. She is sued in her individual capacity.

19.      Defendant Jason Kamras is, and at all relevant times herein has been, the Superintendent for RPS. He is sued in his individual capacity.

FACTS

A.    BACKGROUND.

20.    From August 2023 through June 30, 2025, Clemmons was employed as the Chief Talent Officer for RPS.

21.    Prior to the February 4, 2025 School Board meeting, Clemmons was performing her job well and otherwise running the RPS Talent Office in satisfactory fashion.

22.    Prior to the February 4, 2025 School Board meeting, Clemmons received regular praise for her job performance and had never been disciplined by RPS.

B.    THE SUMMER AND FALL OF 2024.

23.    When Clemmons took over the RPS Talent Office in August of 2023, she soon learned that several of the employees she supervised or was otherwise responsible for were well entrenched in their jobs and had no desire or willingness to take directions from a new supervisor such as Clemmons.

24.    At that same time, Clemmons also learned that *because* many of these entrenched employees were seasoned HR employees, they knew how to take advantage and/or exploit RPS human resource policies, especially the grievance process.  Indeed, in the summer of 2024, two of Clemmons' key subordinates – Ms. Sandra Lee and Ms. Alyson Davis -- filed complaints against her and were seeking to use the RPS grievance process to undermine Clemmons' authority.  Ms. Lee, indeed, had previously served in precisely the role now held by Clemmons (the Chief Talent Officer position) and Ms. Davis had more than ten years of experience working in the RPS Talent Office.

25.    By the fall of 2024, however, Ms. Lee's and Ms. Davis's complaints had been thoroughly investigated and found to be without merit.

C.    THE NOVEMBER 2024 SCHOOL BOARD MEETING.

26.    Undeterred by the findings that cleared Clemmons of all charges, Ms. Davis and Ms. Lee chose to disregard those results and instead escalated their complaints directly to the School Board in a closed session on October 21, 2024, absent of Mr. Kamras or Ms. Clemmons. They spent approximately two hours reiterating the same baseless allegations that had been dismissed, while also introducing additional accusations of which Clemmons had no prior knowledge and no prior opportunity to address.

27.    At the November 11, 2024 School Board meeting, Ms. Davis went to the podium during the public comment segment and began to raise her allegations again, effectively asking the Board to re-litigate matters that had already been investigated and resolved in Clemmons's favor.

28.    As soon as Ms. Davis began to raise the substance of her complaint, however, the then-RPS School Board Chair, Dawn Page, stopped her and politely, but firmly, told her she was raising "an issue that we [the School Board] will be discussing in closed [session]" and that her complaint was "not appropriate at this time." Ms. Davis left the podium.

D.    RPS PERSONNEL POLICIES AND THE IMPORTANCE OF PRIVACY.

29.    The Chair's instructions to Ms. Davis not to publicly raise the personnel matters that she was seeking to discuss were wholly consistent with long-standing RPS policies.

30.    The RPS anti-discrimination and anti-harassment policies, for example, expressly set forth a specific complaint and grievance process for employees who believe they have been victims of harassment (such as a hostile work environment) or discrimination (such as race or age discrimination) to use.  *See* RPS Policy 7.1.1 and 7.1.2.

31.    Those same policies also contain an explicit provision for protecting the privacy of all involved.  The provision states:

> The school division **_will respect the privacy_** of the complainant, the individuals **_against whom the complaint is filed_**, and the witnesses as much as possible, consistent with Richmond Public Schools' legal obligations to investigate, to take appropriate action, and to conform with any discovery or disclosure obligations.

RPS Policy 7.1.2(f) (emphasis added).

32.    The RPS anti-bullying policy likewise sets forth a specific procedure to be followed where an employee believes she has been the victim of bullying.  RPS Policy 7.3.20.

33.    And just like the anti-harassment/discrimination policies, the anti-bullying policy protects the confidentiality of all who are involved in the process, stating that "The complaint and identity of the complainant **_and alleged harasser shall not be disclosed_** except as required by law or policy and/or as necessary to fully investigate the complaint or as authorized by the complainant." *Id.* (emphasis added).

34.    Both Ms. Lee and Ms. Davis were well versed in these procedures and, indeed, they specifically used them when raising their internal complaints about Clemmons.  They also knew that they were improperly trying to circumvent those procedures in order to raise private personnel matters in the public forum of a RPS School Board meeting.

**E.    PERSONNEL MATTERS ARE NOT PROPER SUBJECTS FOR PUBLIC COMMENT.**

35.    While open discussion about School Division matters is generally encouraged and welcomed during public comment sessions at RPS School Board meetings, personnel matters involving RPS employees, as noted above, are considered private.  Where they must be addressed by the School Board, such matters are reserved for the Board's closed sessions.

36.    Keeping the personnel matters of school employees private and/or confidential is not new or unusual. Loudon and Fairfax Counties, for example, have public comment policies that expressly tell speakers that "[c]omplaints regarding division employees **_should be directed_**

_**to**_ the school principal or _**an appropriate school division official**_."[5] [6]

37.    Goochland County goes even further and expressly _discourages_ the airing of complaints involving personnel actions, stating:

> The School Board _**discourages public comments involving a complaint**_ about individuals, _**personnel action**_, student discipline, or pending litigation.[7]

(emphasis added). It says that such "Individual problems and concerns are best managed _**through administrative channels**_."

38.    And Fauquier County leaves no room for doubt: personal or professional attacks on school system employees are off-limits.  No "if's," "and," or "buts."

> Comments that are harassing or amount to a _**personal attack**_ against _**any identifiable individual**_, whether board member, _**staff or student**_, and have potential for causing unnecessary delay or disruption to a meeting are _**not allowed**_. Speakers should communicate concerns _**privately**_ to the school principal or an appropriate school official. _**Complaints regarding division employees should be directed to the school principal or an appropriate school division official**_.[8]

(emphasis added).

---

[5] https://go.boarddocs.com/vsba/loudoun/Board.nsf/files/CS7HSZ49F7C7/$file/2520.pdf (visited on September 5, 2025).

[6]  https://www.fcps.edu/about-fcps/leadership/school-board/school-board-meetings/speak-school-board-meeting/school-board ("Complaints regarding school-based employees should be directed to the appropriate school principal or other school officials.") (visited on September 5, 2025); _Cf._ https://go.boarddocs.com/vsba/hcpsva/Board.nsf/goto?open&id=C4VQK4699EDB#    (Hanover County School Board Policy 1-6.8 (The public comment policy states: "The School Board requests any person with a complaint about a school division employee to first address the concern to the division superintendent.") (visited on September 5, 2025).

[7] https://glnd.community.highbond.com/home/policies/policydoc/0094bfb3-8f23-443b-a98d-9bdcf562191c (visited on September 9, 2025).

[8]                        https://go.boarddocs.com/va/fcps/Board.nsf/files/D86QQ9699ADA/$file/1-6.8%2C%20Citizen%20Participation.pdf (visited on September 9, 2025).

39.     These policies make sense, and they are consistent with Virginia law.  Indeed, the Virginia Freedom of Information Act, Va. Code § 2.2-3700, *et seq.*, explicitly directs School Boards (and other public boards) to go into closed session to discuss personnel matters, such as an employee's performance or possible discipline against an employee.  *See* Va. Code § 2.2-3711(A)(1).

**F.    THE SCHOOL BOARD CHANGES ITS PUBLIC COMMENT POLICY.**

40.     Prior to its February 4, 2025 meeting, the School Board fully adhered to the policy that personnel matters involving school employees should not be discussed in open/public sessions of School Board meetings.  Such policy properly prevented disgruntled RPS employees from using School Board meetings – which are generally live-streamed, recorded, and then saved on YouTube – from becoming a venue for them to launch very public verbal personal and professional attacks on fellow RPS employees.

41.     For the February 4, 2025 meeting, however, the School Board deviated from its established practice and chose to permit certain RPS employees to use the public comment period to air personnel grievances against other school employees. This was a new and unprecedented policy, adopted by the individual defendant members of the Board – acting for themselves *and* as the School Board as a unit -- just days before the meeting.

**G.    THE SCHOOL BOARD KNEW IN ADVANCE OF ITS FEBRUARY 4, 2025 MEETING THAT RPS EMPLOYEES WERE PLANNING TO DEFAME CLEMMONS.**

42.     On or about January 31, 2025, prior to the February 4, 2025 meeting, Elziabeth "Anne" Forrester, the President of the Richmond Education Association, e-mailed all of the individual defendants in a group e-mail.  The e-mail was addressed: "Dear Superintendent Kamras and School Board Members."  A copy of the e-mail is attached as **Exhibit A**.

43.     In her e-mail, Ms. Forrester told the individual defendants that numerous RPS employees had raised complaints about Clemmons. Ms. Forrester described the complaints as follows: "Issues include: inappropriate comments that are racist and discriminatory, excessive supervision, verbal harassment and a hostile work environment, intimidation, outbursts, coercion of workers who have filed complaints and grievances, unjustified write-ups, positions in the Talent Office being filled without proper posting for their applicants, and favoritism in hiring promotions, and reclassification." *Id.*

44.     Ms. Forrester then said that "[a]fter extensive conversations . . . we have come to the conclusion that they only resolution would be the removal of the Chief Talent [officer]."

45.     The e-mail concluded by telling the individual defendants: "We will be attending the February 4 School Board meeting, but ***wanted to send you this information and the statements from those CC'd in writing beforehand <u>for your review</u>**." *Id.*

46.     Attached to the e-mail was a 38-page document that contained numerous written false and defamatory statements from at least fifteen RPS employees.  That document is attached as **Exhibit B**.

47.     At the end of the document, right before the names of the fifteen employees, it said: "***<u>We will be seeing you at the February 4th School Board meeting</u>** and hope you can look us in the eyes and show us the respect we have long deserved." *Id.* (emphasis added).

48.     As well, the employees who were intending to speak at the February 4, 2025 meeting all signed up to speak using RPS's "public speaking" protocol and filling out formal "Request to Speak" forms.  In doing so, they expressly signaled their advance intention to publicly complain about Clemmons about obvious personnel matters.

49.     One employee – Sherrie Brown – wrote "Maggie Clemmons and Hostile Work Environment" on her Request to Speak form.

50.     Another – Shriley Maxwell – wrote "Hostile, Toxic & Verbal Harassment by the Chief Talent Officer."

51.     And a third – Lyndsey Gilliam – wrote "Unfairness experienced re: Chief of Talent."

H.     **EVEN WITH THEIR CLEAR ADVANCE KNOWLEDGE OF THE DEFAMATION OF CLEMMONS, THE DEFENDANTS ALLOW IT TO OCCUR.**

52.      Beginning on at least January 31, 2025 and, upon information and belief, for the next several days thereafter, Defendants had full knowledge that numerous RPS employees were planning to publicly defame Clemmons.  They also knew exactly what defamatory comments those employees intended to say.  However, none of the defendants – individually or collectively – took any effort to prevent the defamation, or to stop it once it began.

53.     Instead, on or about February 3, 2025, as part of their working session meeting, the School Board, upon information and belief, discussed the upcoming defamatory statements about Clemmons and made a collective Board decision that they would allow the employees to make their comments.

54.     One or more members of the School Board then communicated this decision to Kamras, who in turn told Clemmons and members of the executive leadership team just before the February 4, 2025 meeting.  In conveying the School Board's decision, he acknowledged that the allegations against Clemmons were baseless and serious, but stated that no one would prevent the speakers from making them during public comment — despite the Board's advance knowledge that the statements were defamatory and harmful.

55.    Consistent with its decision to allow the speakers (thereby changing its policy about public comments about personnel matters) and consistent with Kamras' comments about the Board's decision, at least fifteen RPS employees spoke at the February 4, 2025 School Board meeting and, in doing so, openly defamed Clemmons.

56.    The entire substance of the defamatory statements is contained in the 58-page document that is attached as **Exhibit C**.  The most prominent defamatory statements, though, include such things as the following:

- "Maggie *intentionally worked at breaking the team down* by refusing to give us the help we needed."

- "Like so many of my colleagues in the Talent Department, I have been experiencing *unlawful conduct, mistreatment, bullying* whenever I have to interact with the Chief of Talent, Maggie Clemmons"

- "I have recently filed a grievance in response to her extremely problematic and *unethical behaviors*"

- "She has *hired friends and neighbors*"

- "…Mrs. Clemmons *mocked my accent*"

- ". . . ever since Maggie has been hired, she has created a *toxic and hostile work environment* and has *violated employee rights*.  She is *unprofessional, racist, ageist, a liar, and an abuser of power who is out of control.*"

- "Maggie Clemmons has *no respect for us as professionals*, or the work that we do"

- "I often feel used up and forgotten, *like a slave on a plantation*."

Each of these statements was contained in *__both__* the 38-page document that was e-mailed to the defendants *before* the February 4, 2025 meeting and the 58-page document that was presented to the defendants *at* the February 4, 2025 meeting.

I.    **THE DEFAMATORY STATEMENTS ARE FALSE BUT THEY HAVE CAUSED SEVERE AND SUBSTANTIAL HARM TO CLEMMONS.**

57.     None of the defamatory statements in paragraph 56 is true.  Clemmons did not intentionally work at breaking the Talent Office team down; she did not engage in bullying, unlawful conduct, unethical conduct, or other mistreatment.  She did not violate employee rights, create a hostile or toxic work environment; or abuse her power.  She did not mock anyone's accent.  And she most certainly is not racist, ageist, or a liar who has no respect for individuals.

58.     Despite the falsity of the statements, Clemmons suffered immediate and severe reputational harm.  The defamatory comments were widely reported in the media, and because of the comments, RPS placed Clemmons on administrative leave just days after the meeting.

59.     Like the defamatory comments themselves, the administrative leave decision also was widely reported in the media.

60.     The public immediately connected the two events and many commenters readily jumped on the (false) "Clemmons created a toxic work environment" bandwagon.  Examples of such comments include the following:





and



61.    Moreover, also in response to the February 4, 2025 meeting and the defamatory comments made therein, the School Board asked Clemmons to resign.

62.    Clemmons refused, but the request itself has caused lasting and compounding damage to her future employment prospects. Every school division in Virginia requires applicants to answer whether they have ever been asked to resign from a prior position, and if so, to explain why. The same question appears on the state's application for license renewal, which Clemmons must complete each time her license is renewed. As a result, Clemmons is now forced, in perpetuity, to disclose that RPS asked her to resign and to repeatedly defend herself against the false and defamatory accusations the defendants allowed to be made on February 4, 2025.

**J.    THE SCHOOL BOARD CONVEYED TO THE PUBLIC THAT CLEMMONS WAS FIRED BECAUSE THE DEFAMATORY STATEMENTS ABOUT HER WERE TRUE.**

63.    In addition to permitting Clemmons to be unlawfully defamed at the February 4, 2025 meeting, the School Board and the individual Board defendants compounded the harm in May 2025 by publicly communicating, in substance, that Clemmons was being removed from her

position because the defamatory statements were true.

64.    While the Board did not explicitly use those words, its actions conveyed the same message. Specifically, while Clemmons remained on administrative leave pending the fallout from the defamatory allegations, the Board simultaneously opened her position for hire and informed the media that she "would not be returning to that role." Taken together, these actions would lead any reasonable member of the public to conclude that the Board had decided to terminate Clemmons's employment because it accepted the false accusations as fact.

65.    Unsurprisingly, that is exactly how the media reported it. Coverage of the public posting of Clemmons's position, in fact, specifically referenced the defamatory statements made at the February 4 meeting and linked back to prior news reports of those comments, thereby further amplifying and cementing the false narrative.[9]

K.    AFTERMATH.

66.    With all this said, Clemmons has been severely and substantially harmed by the actions of the defendants and her future job prospects in public education have all but been destroyed.

COUNT I:
DUE PROCESS VIOLATION: LIBERTY INTEREST
(AGAINST ALL DEFENDANTS)

67.    The allegations of paragraphs 1-66 are realleged as if fully set forth herein.

---

[9] See, e.g., https://www.wric.com/news/local-news/richmond/rps-lays-out-expectations-for-next-chief-talent-officer-after-ousting-previous-leader/ (specifically saying such things as "The search is on for Richmond Public Schools' (RPS) next Chief Talent Officer, following allegations of a toxic workplace.") (visited on September 9, 2025);

68.    Under the Fourteenth Amendment, Clemmons has a liberty interest to engage in the commonplace occupations of her life and with respect to her good name, reputation, honor, and integrity.

69.    Here, the defendants violated Clemmons' liberty interests by falsely indicating that Clemmons was racist, ageist and a liar who had engaged in numerous acts of unprofessional, unethical, unlawful conduct (including creating a hostile work environment), in conjunction with their decision to end Clemmons' RPS employment.  These false accusations are the kind of false accusations that undermine Clemmons' credibility, integrity, and honesty as a public-school employee and/or public servant.

70.    These false accusations impugn Clemmons' good name, honor, reputation, and integrity, thus causing a stigma to her reputation, and were made in connection with his forced separation from RPS employment.

71.    Additionally, the false statements at issue were made public.

72.    As a direct result of the actions of the defendants named in this Count, in violation of the rights secured to her under 42 U.S.C. § 1983 ("Section 1983"), Clemmons has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith.  Additionally, Clemmons has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of their actions.

73.    The School Board is liable on this Count because its actions against Clemmons were the direct result of express policy and/or group decisions made by the School Board itself. But for these policy decisions, especially its intentional decision to change its settled policy that prohibited RPS employees from raising personnel complaints about other RPS employees in public session at School Board meetings, Clemmons would not have been harmed.

74.     Clemmons was not given proper due process as to the false allegations against her. Indeed, Clemmons was deliberately denied any opportunity to defend herself or respond directly to the School Board before being placed on administrative leave, ensuring that the defamatory comments went unchallenged.

75.     Further, the individual defendants' actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Clemmons' rights, thus entitling her to punitive damages.

76.     Finally, the negative public comments at issue in this Count irreparably poisoned the perception about Clemmons to such a degree that any type of name-clearing hearing or post-deprivation remedy would have been futile or ineffective.

### COUNT II – AIDING AND ABETTING DEFAMATION: (AGAINST ALL INDIVIDUAL DEFENDANTS)

77.     The allegations of paragraphs 1-76 are realleged as if fully set forth herein.

78.     Clemmons was viciously and recklessly defamed by numerous statements made by RPS employees, which statements are specifically referenced and set forth in paragraph 56 herein and **Exhibits B** and **C**, which statements were published and were made with the intent to defame Clemmons.

79.     As the allegations above make clear, the individual defendants had full advance knowledge of the defamatory statements at issue, had advance knowledge that the statements were going to be made public at a School Board meeting, and provided substantial assistance in allowing those defamatory statements to be made in public.

80.     The statements at issue are false and purport to be statements of fact, not statements of opinion.

81.     Moreover, the false statements all involve the efforts of the RPS employees who spoke at the February 4, 2025 meeting to demean and disparage Clemmons and to falsely accuse

her of unprofessional occupational activities and unfitness to perform the duties of her job and unlawful behavior, and thus these statements constitute defamation *per se*.

82.     As a proximate cause of the conduct of the individual defendants named in this Count, Clemmons has suffered substantial compensatory damages, including severe mental and emotional distress, reputational harm, loss of sleep, loss of income, humiliation, embarrassment, loss of time, and other damages.

83.     In addition, the actions of the individual defendants permitting and facilitating the publication of these defamatory statements named in this Count were made intentionally, willfully, and maliciously against Clemmons and with utter and conscious disregard of her rights and constitute substantial assistance and encouragement of the defamation, thereby making them jointly and severally liable.

84.     Further, no privileges, qualified or absolute, attach to these statements and Clemmons is not a public figure under the law of defamation.

85.     Finally, Clemmons is entitled to punitive damages in this matter.

WHEREFORE, Plaintiff requests this Honorable Court to:

    a.  Accept jurisdiction of this case;

    b.  Award Plaintiff compensation for the harm that defendants have caused to her by violating her liberty interests. Such damages shall be in an amount in excess of ONE MILLION DOLLARS ($1,000,000.00), the exact amount to be determined at trial;

    c.  Award Plaintiff compensatory and presumed damages for humiliation, mental and emotional distress, and pain and suffering that she has experienced and endured as a result of the individual defendants' unlawful actions of the towards

20

her. Such damages shall be in an amount not to exceed FIVE MILLION DOLLARS ($5,000,000.00), the exact amount to be determined at trial;

d.   Award Plaintiff punitive damages against the individual defendants named in this Complaint in an amount not to exceed THREE HUNDRED FIFTY THOUSAND DOLLARS ($350,000.00), the exact amount to be determined at trial;

e.   Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

f.   Grant Plaintiff her reasonable expenses, costs and attorneys' fees; and

g.   Grant such other and further relief as to the Court seems just and proper.

**A TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,

MAGGIE M. CLEMMONS

By:      /s/Richard F. Hawkins, III
         Richard F. Hawkins, III, VSB# 40666
         THE HAWKINS LAW FIRM, PC
         2222 Monument Avenue
         Richmond, Virginia 23220
         (804) 308-3040 (telephone)
         (804) 308-3132 (facsimile)
         Email: rhawkins@thehawkinslawfirmpc.com