1

Superintendent Jason Kamra & the Richmond City School Board

301 N 9th St,

Richmond, VA 23219

February 4, 2025

RE: Maggie Clemmons & the Hostile Work Environment in the Talent and Finance Departments

Dear Superintendent Kamras and School Board Members,

It pains us as the staff in the Talent Office and the Finance Department to sit down and write this letter. We spend every day working to make sure that the RPS employees in *every* role and department are fairly compensated, treated with respect at every point of their careers, and that our schools are staffed with highly qualified individuals. Every day we set out to do this work, but every day we are confronted with the abhorrent and unethical behaviors of some of the people at the top, most specifically from the Chief of the Talent Office, Maggie Clemmons. In the following pages, we have written out our own experiences with Mrs. Clemmons and other leaders in our departments and outlined our issues and experiences. All of the letters are written from our own personal, lived experiences, and are not related to any confidential files. Through our stories, you will see that every day we are facing issues that include: inappropriate comments that are blatantly racist, ageist and discriminatory; excessive supervision; verbal harassment; a hostile work environment; intimidation; unwarranted outbursts; coercion, especially of staff who have filed complaints and grievances; unjustified write-ups and reprimands; positions in the Talent Office being filled without proper posting for other

applicants; and favoritism in hiring, promotions, and reclassification. The issues we are experiencing from the behavior of the Chief of Talent is not just unethical, but in direct violation of School Board policy 7-3.20: Workplace Bullying, policy 7-21: Posting of Vacancies and Recruitment. Her behavior also has implications with Virginia Code, Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, and even though the CBA for the Central Office Bargaining has not been ratified many of these issues violate the tentative agreements REA and RPS has reached. We ask you all to spend the time to read through this letter *in full*, and hear our stories. We write this with a heavy heart and are asking RPS to live by the motto to "Teach, Lead, and Serve with Love" for *all staff in every department.*

### *Our Stories*

### Sherrie Brown, Human Resource Specialist

The first time I sat down to write this letter, I wrote it very conservatively compared to what I truly went through with Maggie from March to July 2024. She successfully broke me down! This time around, I am writing my full story.

For the past two years, my husband had been battling a critical illness, and I was fortunate to be covered under the Family and Medical Leave Act (FMLA) to care for him as needed. Unfortunately, during a challenging transition within my department, I had to undertake training for home dialysis to provide him with the care he required. This training was vital, as it was the final step necessary to ensure his home care would run smoothly.

On January 1, 2024, a significant restructuring of the Benefits and Compensation Department was set to take place. All team members were to transition into the role of

3

Generalist, while only four Senior Human Resources Specialists would handle comprehensive responsibilities for managing FMLA claims, retirement plans, employee benefits, and compensation matters across all of RPS. Maggie refused to support the department. She made it more difficult and impossible for the benefits and compensation team to support the district employees. There were several email addresses created. All needed to be responded to within 24 hours. We would receive duplicate emails to the extra department emails and our own work emails. It was a nightmare. With only a team of four employees, transitioning the department to the new Generalist/Cluster setup was impossible. I totally agree with the Generalist setup. However, Maggie would not listen to what was needed to proceed with this plan. We needed more help, she actually took one of the FTEs available and split it. Having the employee focus on other tasks in the Talent Office.

The unfortunate reality was that no team member, apart from the director, Alyson, had the knowledge or training to handle FMLA, Short/Long Term Disability processes effectively, particularly while employees were out on leave. Despite the challenges, we agreed that I would continue working and helping train the team while I was also undergoing training for home dialysis. My training schedule was from 9 AM to 2 PM, which allowed me to arrive at the office by 3 PM at the latest every weekday. I committed to working until 8 PM and dedicating additional hours from home during the week and weekends to make up for any time lost.

The reason I continued to work even though I had an approved FMLA on file to care for my critically ill husband was that I felt a commitment to the employees of RPS, my co-workers, and my director at the time. I could not leave the district employees without the help they needed when they were vulnerable- sick and/or had a family member sick, and they needed

answers and support. Even though it was a critical time in my personal life, no one was there to do my job except Alyson, the director. What I received for my dedication, loyalty, and commitment was heartbreaking.

However, four weeks into my dialysis training, I received an unexpected request from Alyson. She informed me that Maggie wanted to meet with me at 6 PM that evening. The meeting began with Maggie unexpectedly stating how much she disliked these types of conversations. This puzzled me, but I kept my composure and listened. She mentioned that she had a report on her desk that she had **not** reviewed, but the report indicated I had missed 568 hours and had not submitted any leave hours for the FMLA time missed. Confused, I tried to explain that I had been actively working during this period. Unfortunately, Maggie insisted otherwise, citing several unanswered emails as evidence of my poor performance and expressed she wanted me to resign.

Maggie intentionally worked at breaking the team down by refusing to give us the help we needed. I can only assume she felt that I was the easiest person to terminate at the time because she did not understand FMLA laws. She could only see that I was not providing the service at the level I usually provided to the employees of RPS. My normal was me giving over and above, working nights, weekends, and holidays to keep up with the demand of managing FMLA for the district without any support from others.

During this tense exchange, she acknowledged that while my work had previously been "good, really great", the current situation left her feeling compelled to suggest that I resign until my personal circumstances improved. She was direct, saying I needed to think about my last working day, but she assured me I didn't have to decide on the spot. I left the meeting with a

5

racing mind—overwhelmed by the department changes, my ongoing training, and my responsibilities towards my team. To my dismay, Maggie accused me of being a liar, a thief, and a presently ineffective employee. The weight of these allegations felt crushing, I was already aware that the administration needed someone to manage my tasks if I was terminated.

Exhausted and emotionally drained, I found myself contemplating the possibility of resigning. It was a tempting thought but came with the knowledge that I had been sacrificing my husband's care due to my work commitments. In the days following the meeting, Maggie continued to contact me relentlessly, pressuring me for a response. In her final message she continued to bully me, and she asserted the urgency for me to call her back as she needed to post my position, closing with a disingenuous, "thank you so much." When I failed to respond by the Friday deadline, her demeanor shifted to being more aggressive, and I felt I could no longer engage with her.

Maggie then drafted a document filled with misinformation and sent it to me via email, stating that she would seek Jason's approval to present it to the board for my termination. She was mean and vindictive, she made up lies about me stealing time and discipline meetings that never occurred with my director. Feeling overwhelmed, I sought help from my doctor, who completed the necessary FMLA paperwork for me and referred me to a therapist. I promptly submitted this information to Alyson.

Tragically, five days after submitting my FMLA documentation, my husband suffered a final stroke. His passing on May 24, 2024, left me devastated, and I remained under the care of both my doctor and therapist during this difficult time. After breaking me down to the point of taking FMLA she continued to threaten my job. I have saved phone messages from her asking

me to let her know my date of resignation "she really needed to post my job" during the most difficult times in my life. Eventually I believe someone alerted her that she was breaking the law. So she backtracked by stating she did not receive my email stating my doctor placed me on FMLA. She said maybe I sent it from a different email and the email may have gone into her spam mail.

In July, I experienced an issue with my paycheck, which necessitated a visit to the payroll department to pick up a paycard. After retrieving it, I stopped by Alyson's office, where she informed me that Maggie intended to place me into a position in Employee Relations when I returned to work. I was taken aback and replied, "What?" Alyson said, "Maggie didn't call you?" When I confirmed that I hadn't been in contact, I expressed my fear that I would be terminated once my doctor cleared me to return.

In a state of confusion, I went directly to Maggie's office. To my surprise, she greeted me warmly, as if nothing had transpired between us. Maggie embraced me, expressed her condolences for my loss, and informed me that I would be returning to a position in Employee Relations. She mentioned that after reviewing my records, she believed I was a suitable candidate for the role, as I had previously applied for a position there. The sudden change in her attitude left me apprehensive, and I hesitated to inquire about what had sparked this drastic turnaround.

Once my doctor and therapist officially cleared me, I returned to work on July 22, 2024. Later, I learned that my case had been brought to Employee Relations. The investigators quickly identified discrepancies in the information presented, noting that various pieces didn't align logically.

Maggie behaved as if she wanted to take my position and replace me with someone she wanted to replace me with. She was committed to spreading lies about me and my work. She told me she was going to write me up, give it to the superintendent, ask him to sign off on it, and submit it to the school board for my termination.

When all of this happened, I was 56 years old, two months away from 57. I had medical issues and expensive prescriptions. When Maggie threatened to take my income and my health insurance benefits away and wrote all of those terrible things about me and my work performance, she eventually broke me down. Shortly after this time, my husband had his final stroke; he was still alive, but I couldn't take anymore. My doctor referred me to a therapist, and I was placed on medication for anxiety and depression.

I know all of this information seems unbelievable, but I have no reason to make this stuff up. As a human resources chief, she actually did and said those things to me.

As stated in my letter, I could return to work on July 22, 2024. I was never told how I could return without termination or any discipline. I returned to the Talent Office in the Employee and Labor Relations Department.

I can honestly say that if any of my previous team members were in my place right now, they would not commit to writing this letter, sharing their personal details of last year, and getting involved with the problems of the Talent Office. But when I found out Maggie continues to be an abusive leader, I agreed to help by sharing my experience, with hopes of helping others who are still suffering.

I pray my story helps; I pray things change!

**RPS Comps and Benefits Department: Letitia Lampley, Van Shelton, Marie Holmes**

This piece of this larger letter has been written by multiple members of the Compensation and Benefits department and outlines how the behaviors of the Chief of Talent, Maggie Clemmons, has created a toxic and hostile workplace environment for all of us. Since she has been Chief, our workload has significantly increased, and we are performing tasks that were not part of their original job description. Our responsibilities have expanded, and we are now accountable for more complex tasks and larger projects. Our skills are being underutilized—we specialize in the role we were initially hired to do, and we are doing tasks outside of those skills. We are unfairly targeted with additional duties, we are responsible for unattainable deadlines with our current staff, and we are overlooked and undervalued.

On March 7, 2024 we submitted a formal request via email for desk audit because the workload we had was impossible to manage with the current staff that we have. We stated to her that this was an impossible task to handle and to reconsider the change made and to get additional employees to work with FMLA, especially since our colleague Sherrie Brown was off work. We have 4 full-time FTE's that have been placed on us without proper training or compensation for the grade that we are currently on, which is Specialist. We are the only staff in the Talent office that have 4 FTE to handle and 3 email inboxes to manage along with the mammoth workload that comes along with our daily responsibilities. We requested this audit because she had no idea of what our jobs' workflow constituted and how much time it took to process just one item before she made the changes, even though our Director, Alyson Davis shared with her that this also would not work.

9

Once she received our request, she verbally came into Alyson Davis's office, while we were meeting on March 11, 2024 and stood in the door and stated that she would not request a desk audit for us. She also stated that we were going to be Generalist (this did not take place), and that she would get with Alyson Davis to have us placed on the correct grade to the amount of work that we were processing, (that also has not taken place). After verbal denial, once again, we sent her another email April 9, 2024, requesting a written request to discuss the desk audit, she did answer, and we have included her insufficient response.

In the meantime, we asked for additional staff to help with the magnitude of work that we are struggling to process. In the time since we submitted this request for additional staff, she had not hired any additional staff for our department, but she has hired 3 new full-time employees (a Project Manager and a Labor Relations Specialist, and a Receptionist) and upgraded two employees (from Specialist to Manager and Manager to Director.)

Our director, Alyson Davis, has continued to speak with Mrs. Clemmons about our duties, and in September of 2024 she was asked to write up a written proposal with the details for Mrs. Clemmons after speaking with her about realigning the duties of our department. After this conversation, Alyson Davis presented the requested written proposal for the realignment of duties for her team on November 7, 2024. It is important to note that no other Directors, besides Alyson who is a black woman, were required to present a written proposal for any changes to their teams. On November 18, 2024, Maggie emailed Alyson with a denial of her realignment proposal stating that "they," meaning Leadership, said that she did not need additional FTE's for

her team to run efficiently to take care of Compensation and Benefits for 5,000 + employees, while other teams in the Talent Office have received additional staff members.

For you to understand the significance size and scope of the work we have been asked to do for over 5,000 employees with extremely limited staff, we have included the following list:

- **Compensation**
  - New Hires
  - Change of Contracts
  - Transfers
  - Leaves
  - Separations
  - Maintaining 2 HRIS platforms since 9/2024
- **Benefits**
  - Open Enrollment
  - Life Changing Events
  - New Hire Enrollment
  - Termination of Benefits
  - Death Benefits
  - Quarterly Audits
- **FML**
  - Maintain FML Spreadsheet
  - LOA's

- o   Meet Mandated Federal Guidelines

- o   Process short-term and long-term disability benefits

- o   Remove employees from payroll

- o   Return employees to payroll

- o   Use the STD platform for administering disability benefits

- o   Calculate Paid Parental Leave

- **Retirement**

- o   Counsel Employees on Retirement Benefits

- o   Prepare retirement estimates

- o   Maintain the retirement information through VRS Platform

- o   VRS Batch File submission (retirement benefits)

- o   Maintain and Process Transition payments through the Trust Account

We are being asked to do all these tasks, plus others outside of our official duties with no more support. The Chief has created a toxic environment where our jobs seem to be ever expanding with no end in sight. It is clear, from the lack of support to all the obstacles put in front of our director, that Maggie Clemmons has no respect for us as professionals, or the work that we do.

**Alyson Davis, Director of Benefits and Compensation**

My name is Alyson Davis, and I am the Director of Benefits and Compensation.  On June 10, 2024, my colleague, Sandra Lee, and I filed a complaint of discrimination against Chief Talent Officer Maggie Clemmons.  Though we are not union members, we, as co-workers and

women of color, feel compelled to support our colleagues who are bravely sharing their own experiences of discriminatory and unfair treatment by the Chief Talent Officer. As a proud RPS alum of Huguenot High School Class of 1991 and RPS employee who has served in the Talent Office for 23 years, daughter of a retired RPS teacher and RPS alum of Maggie L. Walker High School Class of 1964, granddaughter of an RPS alum of Armstrong High School Class of 1939, it breaks my heart to hear my colleagues' experiences. There are unfortunately more accounts of negative behavior by Ms. Clemmons, but many of our colleagues are too afraid to speak up because of the real threat of retaliation from Ms. Clemmons.

Sandra and I have been enduring the complaint process for eight months. When we filed the complaint in June 2024, the Administration assigned Chief Wellness Officer Renesha Parks to investigate the complaint. On November 12, 2024, we were notified that the former School Board decided a second, independent investigation was needed. We have been notified that the investigation report will be completed soon, and we respectfully request access to the complete independent investigation report and access to all of the versions of the previous investigation reports that were emailed or shared with Superintendent Kamras. We also respectfully request an opportunity to discuss the findings with you in a closed session.

Since filing the complaint eight months ago, we have both had to work in an increasingly hostile work environment. We frequently encounter the following from Ms. Clemmons: hostile tone, dismissive eye rolling, public criticism, gate-keeping of resources to ensure we have an excessive amount of work, and disproportionate disciplinary action. My department, the Benefits and Compensation Department, is severely understaffed. We have only six staff members, including myself, and it has always been too small to properly support almost 5,000

13

employees. Though I have requested additional support from the Chief Talent Officer multiple times, we have been denied and set up to fail. In the current fiscal year, four new FTEs have been allocated to Talent Office Departments, but none to Benefits and Compensation. In the FY26 Superintendent's budget proposal presented at the January 21st School Board meeting, seven new FTEs were requested under Priority 2 for Talent Office departments, but none for Benefits and Compensation. My team and I are unable to perform our jobs effectively and efficiently due to competing priorities with compensation, benefits, leave administration and retirement. The current volume presents significant challenges that make it difficult for us to achieve the desired level of customer service our employees deserve. With limited resources, overlapping demands and lack of administrative support, it is impossible to allocate the necessary time and attention to each priority. While these challenges are undeniable, I have been directed to issue disciplinary letters to my team for every occurrence of a missed timeline or deadline. Again, we have been set up to fail.

I sincerely hope that you hear what is being shared and swiftly address our concerns about the Chief Talent Officer.

Thank you.


**LaMeekia Evans, Payroll Technician**

Richmond Public Schools' slogan is "Lead with Love." This saying reminds us to let love motivate us to be giving, caring, fair, and uplifting to others and our community. However, I cannot say this has been my experience as an employee at the RPS Central Office. I have

noticed that this mantra does not seem to apply to Central Office employees. The culture within the Central Office departments often foster favoritism and show a blatant disregard for employees' mental well-being and work-life balance.

I started as a temporary employee in December 2021 and became a permanent employee in March 2022. I quickly learned my job and assisted my colleagues with their tasks in addition to my own. In fact, my team came to depend on me for new tasks and backup support. Because of my dedication, I was entrusted with responsibilities such as FMLA, additional locations, and collective bargaining. Despite an increasing workload, my salary did not reflect these changes. I had several conversations about my pay but was always given excuses such as "it's not in the budget," "There's something in the works for finance," or "No, I need to learn more." This was not the case for some of my white colleagues, who received pay increases and reclassifications. For example, a position was created in the payroll department called Payroll Staff Accountant, which allowed a white colleague to receive an increased salary, a reduced location scope, and act somewhat like a supervisor.

After she left RPS, many of her duties were assigned to me, significantly increasing my workload. I confirmed that the steps for reclassification needed to be completed by the department director and the chief. I formally requested reclassification but faced delays and was told that, if granted, it wouldn't take effect until the following year.

Understanding this, I requested a 10% salary increase due to my increased workload but did not receive a response for a long period. Eventually, I was countered with a lower offer,

which I found unfair. I decided not to accept it and asked for a reduction in my workload. Instead, more tasks were assigned to me, despite leadership acknowledging my extra efforts to ensure timely payroll for RPS employees.

In late October 2024, I requested the 10% salary increase again, providing a list of my current duties. Still, I received no response. I then attended the Board Meeting on November 11, 2024, to speak about the payroll situation and unfair compensation. As a result, I was punished with an automatic denial of my raise that same night, receiving no additional pay, only more demands and responsibilities.

As a department, we often feel disregarded. The implementation of the Linq system has been incredibly stressful for the finance department, especially for payroll. The pressure to launch this program has adversely affected the mental health of our team. We are required to work long hours and frequently take work home.

During the transition process, we raised several concerns that could lead to significant problems, but many of these concerns were dismissed by leadership and never addressed. The payroll department is not adequately equipped to handle these changes. Our current understanding of the system is basic and will not help in resolving the complexities of employee pay issues, such as retroactive payments, leave adjustments, FMLA, payment research, and others. Because of this, we are at risk of failing in our responsibilities.

Decisions made by leadership demonstrate a lack of sensitivity to these issues. The prevailing attitude seems to be one of stubbornness, pushing us forward without regard for the

challenges we face. This predominant attitude of stubbornness, inconsistency, and erratic decision-making has caused complications in other aspects of our work. For example, how the OA 10% is being processed.

This guidance has made me realize that I feel unappreciated, but also overworked and mentally exhausted. I have lost valuable time with my family and my health due to these circumstances. I dedicated countless hours to reflect on the RPS slogan to lead with love, only to find it has been to my detriment, as I do not receive anything in return. I often feel used up and forgotten, like a slave on a plantation. Is this the true culture that RPS reflects?

**Lyndsey Gilliam, Office Associate III**

My name is Lyndsey Gilliam, I am an Office Associate III at Richmond Public Schools for the Employee and Labor Relations (ELR) Department. I made the lateral move in October of 2023 to ELR department from RPS – Adult Education.

During my time in my new role, I was told by the Chief Talent Officer Maggie Clemmons to take on additional responsibilities that extended beyond my primary role in supporting the ELR Department. Specifically, I was tasked with managing the office renovations for the entire Talent Office team and coordinating the move to two different floors. This included coordinating the logistics with movers, liaising with vendors such as painters and carpet installers, and ensuring that both departments were operational during the renovation process. This also included liaising with RPS Facilities, City Maintenance, and Technology Services. In addition to

these responsibilities, I was also responsible for managing purchasing and inventory for the entire Talent Office.

Despite performing duties beyond my job description as an office associate during this time, I did not receive any additional compensation, such as an additional work stipend, nor was I made aware by the Chief Talent Officer that such compensation might be available. This situation has led to feelings of frustration, as I have been performing duties that would typically fall under the responsibilities of multiple staff members, without any recognition or adjustment to my compensation.

I was also told by the Chief Talent Officer that I could not be considered for a reclassification to a position reflecting my actual work, despite the fact that I was already performing many of the duties associated with it. It was incredibly frustrating to hear this, as I had taken on the responsibilities of not just one, but at least two office associate positions, yet the Chief Talent Officer denied fair compensation for the additional work I was required to do for the Talent Office.

After I learned about a new Executive Office Associate position being created with the intention of giving it to a non-contracted, white employee without a job vacancy posting, interview process, or any consideration for others within the department, I felt both ignored and undervalued by the Chief Talent Officer. This felt like a direct contradiction to the standards that were set when I initially inquired about a potential reclassification to a similar position. I tried to address my concerns through the grievance and complaint process, outlining my frustration and

feelings of inequity, but the response I received was dismissive. I was told that since I had not worked overtime, I was not entitled to additional compensation and that I could simply apply for the job when it was posted. However, this response completely disregarded my core complaint—about the lack of recognition and fairness in the treatment I had received, which I believe stems from a larger pattern of discrimination.

Since then, I have continued to reflect on how this situation has unfolded, and I find it difficult to reconcile the way my contributions have been overlooked. Most recently, I discovered that the position had finally been posted, but with new requirements that disqualified me from applying to the position. This was a change from the initial online job description, and it seems to be designed to make the role inaccessible to myself or other highly qualified Administrative Office Associates and Office Associates currently employed in the district. Given that the requirements were altered months after I had already expressed my concerns and filed a grievance, the Chief Talent Officer moved the goalposts that specifically exclude me from consideration. This feels not only unfair, but also retaliatory. The existing Executive Office Associate II on the RPS website does not have a bachelor's degree requirement. I find it deeply concerning that the goalposts keep shifting, especially after expressing my dissatisfaction with the initial handling of the situation.

Given these circumstances, I am here to formally express my continued dissatisfaction and to request that my concerns be fully addressed. It is RPS School Board policy to post new positions.  I am seeking fair recognition for the work I have done and continue to do.  I hope that my experience, professional growth, and qualifications are taken seriously in the context of this

situation. It is important to me that not only my efforts are recognized, but that the hiring process is handled equitably moving forward, especially in light of what I perceive as discriminatory practices.

At this point, I hope that my experience be reconsidered, and that the handling of both my compensation and my professional growth within the department be properly addressed. I want to ensure that my hard work, dedication, and the responsibilities I've taken on are recognized, and that moving forward, the process of job postings and reclassification is handled transparently and equitably.

**Jodi Granger; Executive Office Associate**

I have been an employee of Richmond Public Schools since 1997. I have worked at Blackwell Elementary School as an SIS Op, Linwood Holton Elementary as an Administrative Office Associate, and currently work in the Central Office as an Executive Office Associate. As an Executive Office Associate, I have worked with the Executive Director of Elementary Schools, Assistant Superintendent of Elementary Schools, Chief of Schools, and currently Chief of Talent. During all of my years with RPS, I have felt like I was treated with respect and dignity, until the start of the 2023-24 school year.

In August of that year, Maggie Clemmons joined Richmond Public Schools as the Chief of Talent. Ready to continue doing the work I have been doing for years and enjoy, I had my one-on-one meeting with her, where she stated that she was self-sufficient and she did not need an Assistant. So, I continued supporting the Director of Compensation & Benefits and

Director of Teacher & Leader Pathways at Mrs. Clemmons' request. However, I saw on the Richmond Public Schools website that the Chief of Talent posted an Executive Office Associate position. When I asked her about the position, she stated that she wanted me to continue to support the Teacher & Leader Pathways Office. My duties in Compensation & Benefits were given to the new employee hired by her, a younger white woman. I was pushed out of my position without any justification or due process. When thinking about my situation, it is hard to not see the obvious racism and ageism. I am a Black woman who has been doing this type of work in RPS for over 14 years with no issues and was originally told by Mrs. Clemmons that she did not need an Assistant, to only be replaced by a younger white woman a year later. In the same conversation with Mrs. Clemmons where I was told I would be moved and replaced with no justification or due process, I asked a simple question, "What will my new title be while supporting the Teacher & Leader Pathways Director?"  She stated, "I don't know, Talent something." That was a punch in the stomach and showed how little thought was put into changing my position. It feels like it didn't matter to her what my work looked like, as long as there wasn't a more seasoned Black woman working as her assistant. She is truly messing with my livelihood.

Richmond Public Schools motto is "Teach, Lead, and Serve with Love", how about adding, "Hire with Love" and that starts with having a Chief who respects her staff for their experience, regardless of her own bias.

**Sandra Lee, Director of Employee Relations**

My name is Sandra Lee, and I am the Director of Employee and Labor Relations (ELR). In the spring of 2020, I accepted the offer to serve as the Chief Talent Officer and moved my family across the country, despite the global pandemic, because the strategic plan for the division and the leadership team were so inspiring to me. As an immigrant, a former teacher and principal, and as a parent, I felt like Virginia is the right place to raise my family, and RPS is the right place to spend the last years of my career. After serving through the pandemic, I became ill and had to take medical leave. When I was healthy again, I wanted to return to RPS, not as Chief Talent Officer even though Superintendent Kamras welcomed me back into the position, but as a leader in what was then the Employee Relations Department because I knew I could provide focused and effective leadership in both employee relations and labor relations. Today, ELR's small but mighty team of 10 people now manages all employee relations matters, labor relations, investigations, ADA accommodations, Title IX for students and adults, and VEC hearings. It's a rather large work portfolio, but our team has a passion for providing support because I know that no matter what our titles may be, all of us ultimately have an impact on student learning. When issues or concerns come to ELR, we make every effort to help achieve resolution as quickly as possible so everyone can refocus on supporting each other and serving students.

Retaliation, unfortunately, has been an ongoing issue at RPS, and Alyson and I can now attest to the impact of microaggressions and retaliatory behavior from the administration. I recently received a letter of reprimand from Ms. Clemmons for permitting a staff member to attend a professional development training in-person rather than online, at no additional cost to

the division and with her goal of obtaining training materials met. Per School Board policy 7-6.4, it was my responsibility to meet this employee's educational needs. The policy states, "The School Board, the division superintendent, and his/her staff will make every effort to gear in-service programs to the special needs of employees. To this end, employees will be given opportunities to help identify in-service education needs." Did we not learn that virtual on-line teaching does not meet the needs of all learners, regardless of whether we're talking about children or adults? The letter of reprimand, which is the very first disciplinary letter I've ever received, was dated December 10, which is shortly after Ms. Clemmons found out that the Attorney General's Office referred my complaint to the EEOC. This felt intentional. Alyson and I were also removed from the administrative unit negotiation team because, as Superintendent Kamras shared, he "was under the impression you and Alyson wanted to sit with the union for the (Principals, Assistant Principals, and) Directors unit." Neither of us are union members and no one spoke to us about this. However, another Director was allowed to continue to serve on the negotiation team. This, too, felt intentional.

To me, as a SHRM-SCP certified and experienced people leader, the disproportionate, unjustified, and unevenly applied progressive discipline Alyson and I have been enduring from Ms. Clemmons is a clear indication of retaliation. I am deeply concerned about Ms. Clemmons' actions towards us and our colleagues in the Talent Office. It is impossible not to see who Ms. Clemmons treats respectfully and fairly at work and who she does not. The morale in the Talent Office is the lowest I have ever witnessed in any environment I have worked in or investigated. It is a toxic work environment. I have personally witnessed numerous school board policy

violations by Ms. Clemmons, and I have shared the documentation with the investigator. Besides speaking with the two investigators, the lack of communication about our complaint and retaliation concerns has been astounding. The first conversation I had with Superintendent Kamras about these matters was January 23, 2025.

During the span of my entire career, I have witnessed and experienced plenty of discriminatory behavior before, but I have never, until now, filed a formal complaint or not been able to quickly come to a resolution. Please know that previously we did not want to publicly share our complaint and tried to just manage through the complaint process and the retaliation. However, once it became clear there is a pattern of discriminatory and unprofessional behavior by Ms. Clemmons, Alyson and I realized that we needed to come forward for others to know that they are not alone. I sincerely hope that there is resolution for the entire Talent Office so we can put all of our energy towards recruiting, supporting, and retaining RPS employees.

**Bernice Lewis, Human Resource Associate**

Like so many of my colleagues in the Talent Department, I have been experiencing unlawful conduct, mistreatment,and bullying whenever I have to interact with the Chief of Talent, Maggie Clemmons. In my personal situation, this has been going on since August 2024 through January 2025, and like too many of my colleagues I have recently filed a grievance in response to her extremely problematic and unethical behaviors. In the following letter, I will go through some of the issues outlined in that grievance.

When Maggie Clemmons joined RPS in 2024, she scheduled a one to one meeting with the staff. During our meeting, I explained my job duties and responsibilities, and she responded by telling me, "That is a lot for one person to handle," and that she would look into getting me support, which has never happened. At the same meeting, she asked me if I could, "share the office gossip with her," and seemed very upset when I told her I could not do that because I was not involved in the office gossip. Ever since that conversation, I have been refused support by Maggie on every occasion and have been left in the wrath of her extremely unethical behavior.

During Maggie's time at RPS, it has been increasingly clear that she has been dismissing African American staff to hire younger white staff, especially those who know her. She has hired friends and neighbors, all of whom are white, and has violated protocol on multiple occasions to make their experience easier. These staff members are being placed at significantly higher steps than veteran African American women, despite not having the same level of experience.

Early into Maggie's time at RPS, I asked her if she still wanted everyone to come into the office for onboarding. She said yes and that there would not be any exceptions made for anyone. Exceptions to that rule have been made for staff recently hired who are her friends from outside of RPS, and for School Board members, which is a violation of requirements set out by the Department of Homeland Security. When I asked about scheduling the required in person onboarding for School Board members, Maggie told me in an extremely nasty tone that "No you will not. I do not want them coming into the Talent office, they don't need to, and I don't want them in here." Especially in these moments, she abuses her power to the point that I am constantly in fear of insubordination if I do the right thing. I have watched her break policy and

protocol multiple times and she has messed with people's livelihood because she refuses to be told she is wrong.

On a more personal level, I am someone who has always prided myself on my work ethic and ability to get work done. I am good at my job, and Maggie Clemmons refuses to give me any compliments on my work but will consistently point out any error. She has even fabricated stories about me, specifically trying to have me reprimanded for not completing work I had in fact completed. I have had directors ask me if Maggie sent me their words of gratitude for my work, which she has never done. She constantly works to make sure I do not feel appreciated in my role.

I want to finish with my most recent experience, which pushed me to file a grievance and come out about her behavior. On Wednesday January 15, 2025, Maggie Clemmons came to my office around 12:30 p.m. and told me she needed me to move my office to the other side of the building because she wanted only the recruiters on this side of the building. I responded to her and stated that it was Wednesday already, and I had already informed her that I would be out of the office the next day for an appointment, so Friday was unreasonable. She responded in an extremely disrespectful tone that it needed to be done by the end of the week. During this conversation, I also asked her a question about my job responsibilities since there were a lot of changes being made in the department, and they had not been communicated to me. I asked a question about if my duties would change because of these changes, and she responded in a very loud and aggressive tone that my duties would not change and "I don't have the right to make that decision." When I responded stating that I was not trying to make a decision, but to

get clarity on changes to my duties, she said it sounded like I had a problem with a recruiter and then proceeded to call me passive and aggressive when I explained the situation she was referring to. During this whole exchange, my door was open while she raised her voice at me. As she stood up, she said she wanted to meet with me, and afterwards I told her I did not feel comfortable meeting without her supervisor and my union representative present. She proceeded to roll her eyes, frown and leave.

Later that day I met with Mr. Kamras with my representative present and told him how the disrespect and bullying has been happening since she started working here and that her behavior cannot continue. In this meeting, I shared how she abuses her power and how it is extremely clear she has no HR experience and does not know what she is doing.

I say all of this, with so many more horror stories about her behaviors being left unwritten, because ever since Maggie has been hired, she has created a toxic and hostile work environment, and has violated employee rights. She is unprofessional, racist, ageist, a liar, and an abuser of power who is out of control. She needs to be removed from RPS immediately.

**Shirley Maxwell, Substitute Specialist**

For the past three years, I have single handedly managed the Substitute Office for the entire district along with SmartFind Express. This work has always been difficult, especially due to staffing issues, but the Chief of Talent, Maggie Clemmons, has continuously made this work almost impossible and has created an extremely hostile work environment. I have recently filed

a full grievance that outlines my situation in full detail, but in this letter, I was to highlight some of the most atrocious behavior I have witnessed from Mrs. Clemmons.

Shortly after Mrs. Clemmons began working with the Talent Office, we engaged in a brief conversation related to the Substitute Office, and in the course of the conversation, I used the word "ninth" Mr. Clemmons mocked my accent by emphasizing the pronunciation of the "th." This was done in a public area outside of my office where other co-workers were present. I was extremely embarrassed to say the least. I am a proud Afro-Latina who is not embarrassed by her accent, and who has accomplished a great deal and has worked hard for the benefits of our scholars and for RPS as a whole.

Ever since, Mrs. Clemmons has addressed me in a disrespectful and condescending manner on multiple occasions. Her approach has been forceful, abrupt and at times with an elevated voice. There was a situation where another colleague and I purchased furniture for our offices using personal funds and moved said furniture ourselves. Earlier this month, Mrs. Clemmons informed me that I was being relocated to another office. I asked if I could take my desk since it was purchased with personal funds, and she abruptly responded: "No, I am not moving any desk." I explained to her that it was purchased with personal funds, and she repeated in an elevated voice, "the desk will remain in the office where it is at, I will get you another desk from surplus."

Another one of these occasions was after my sister-in-law passed away on September 11th, 2024. I notified Ms. Clemmons and Mr. Michael Dixon, former Director of Talent Acquisition, the same day the unfortunate incident occurred via text message. I came to work to wrap things up for the day. My intention was to work until 12 noon. While I was in a meeting

with Mr. Dixon, Mrs. Clemmons interrupted the meeting abruptly concerning payroll issues. Sadly, none of the issues she brought to my attention were resulting from anything I had done. The most disturbing part is that Mrs. Clemmons knew that I had suffered the loss of a family member, and it was the first time she had seen me after I had informed her of the unfortunate incident. She addressed me at least on two different occasions in the same manner. Because of her demands, I did not leave until 2pm.

Sadly, this was not the first time Mrs. Clemmons has asked me to perform tasks outside of my responsibilities as the Substitute Specialists with little regard for the fact that I am managing the Substitute Office with little to no assistance. She has demanded that I set up the absences for staff in SmartFind for training despite the fact that either the Teacher or the Timekeepers are responsible for submitting their absences in these situations, even after I provided her with that information. At the same time she is asking me to perform tasks outside of my responsibilities, each time Mrs. Clemmons attends the Principals' meeting and returns with negative feedback indicating that I do not respond to emails in a timely manner or that Principals are complaining that I am not available. I have been told by multiple people in those meetings that she has propagated the notion that she does not know "where is Ms. Maxwell." In a meeting with her, she indicated that if the School Principals continued to complain about me, she may not be able to secure my job. After meeting with Mrs. Clemmons, I felt that my job was threatened, and I sent her a follow-up email outlining my heavy workload. Teacher vacancy is inevitable due to various reasons, termination, FMLA, dissatisfaction with management or the work environment. As previously mentioned, for the past three years I have single handedly managed the Substitute Office for the entire district along with SmartFind Express. I also spoke

with a number of Principals throughout the district, and they informed me that they cannot understand why I have not been provided with an FTE.

Mrs. Clemmons' resolution to hire Part-Time employees whose responsibility is not solely dedicated to the Substitute Office, has been insufficient, and she continues to get into the way of the work I am trying to complete. At the end of every school year, I follow a set of steps to ensure RPS long-term Substitutes return the following school year. While doing this work for the 2024-2025 school year, Mrs. Maggie Clemmons ordered me not to communicate with any long-term Substitute Teacher because we will not need any long-term Substitute for the school year. I approached Mrs. Clemmons on three different occasions, especially since we had five RPS 200 schools starting in July with a number of vacant positions requiring a long-term Substitute Teacher. The last time I approached Mrs. Clemmons, she yelled at me and said, "No long-term subs, no long-term subs, no long-term subs." She continually put roadblocks in my way during this process and refused to allow me to properly and efficiently communicate with substitutes and created unneeded vacancies.

It is noteworthy to mention that while I was trying to procure hundreds of Substitutes in a short period of time, I was pulled from my responsibilities to assist the former Director of Talent Acquisition and Mrs. Maggie Clemmons to create several reports they needed. Interestingly, these reports are normally asked of the Recruiters who have a clear understanding of how many Teachers have vacated the district. I expressed to both Maggie Clemmons and the Director, Micheal Dixon that the many projects they have asked me to complete unrelated to the Substitute Office were impacting my ability to procure the necessary Substitutes throughout the district, and my pleas went unanswered. All of this compounded to create an extremely stressful

and difficult work environment and had an extremely negative impact on my health due to the amount of stress I was facing in such a short period of time.

Mrs. Clemmons has actively made my work environment extremely hostile and continues to create an extremely toxic and stressful working culture.

Mrs. Clemmons In her own words during her first meeting with the Talent Office indicated the following: "I know nothing about HR, I read a book and passed the interview." The decisions Mrs. Clemmons made as regards to the Substitute Office are a reflection of this fact because it had a negative impact on our district.

**Helen Mickens-DeMena**

Hello, my name is Helen Mickens-DeMena. I was the Director of Talent Acquisition for Richmond Public Schools. I started with RPS as the Talent Acquisition Manager in October 2017. I was promoted to the Director role in 2018 and had functioned successfully in that role through August 2023 when the new Chief Talent Officer, Maggie Clemmons, arrived. I actually had high hopes for the progression of the HR team, as the Talent office had been without a Chief consistently for quite some time. We really needed someone to lead the HR initiatives that were getting a lot of focus throughout the division at the time (Collective Bargaining, Recruitment of Teachers, and Equitable Compensation). Unfortunately, Maggie came with very little if any HR experience. She had never specialized in any of the HR facets (Recruitment, Benefits, Compensation, Training/Learning and Development, or Employment/Labor Relations. Each of the HR Directors had at least 15 years of HR experience at the time. At the time, I had 26 years of HR experience with 12 of those years leading a team in an HR specialty area

(Recruitment). I wondered if anyone questioned her qualifications and selection for this role. Although my peers and I were told we would have an opportunity to interact/interview the finalist, we did not. I just received an email that an offer needed to be made to her. Once I reviewed her resume, I said to the superintendent that if were the board I would question the selection, because she didn't appear to have a vast HR knowledge which to me would be needed for the Chief role. No response was ever given to me.

Maggie joined the team on August 2023. On day one she was not friendly. My introduction to her was when I spoke to her and she ignored my greeting and acknowledged the greeting she received from one of my team members, who previously worked at another school district with her. She never acknowledged my hello and walked right off and continued talking with my employee. This was the beginning of my mistreatment at her hands. Maggie gave the notion from the beginning that I was incompetent and did not know what I was doing. I felt that she came into the role with preconceived notions about me. During my initial meeting with her, she asked me about the gaps and opportunities that she heard that we had. Maggie never asked me about my thoughts about the team & RPS and what I thought the strengths and opportunities were. Maggie never truly considered me a part of her team and it was very clear. She didn't ask about any of the successes or accomplishments of the team. She also didn't ask me about my experience to understand the value I bring to the team. Maggie didn't want to hear about that. But what she wanted to hear about were any gaps or misses my that my team had. She was all about that. Maggie had no problem emailing me about anything that someone from another team said we did. She would never ask questions or have a conversation. The result was

always an accusatory email. I would typically respond, pleading my case or defending my team member. This would then result in a long email from Maggie further reiterating why I was wrong and what I should do as a Director. Getting email messages like this on a regular basis was very demoralizing and deflating. I couldn't do anything right in her eyes and it was clear.

Maggie encouraged people that I would normally work with to go to her rather than come to me for issues. Now mind you, I had been leading the recruitment function for 6 years prior to Maggie joining. During that time, directors, principals, chiefs and vendors would all come to me for recruitment guidance. This call came to a complete halt about a month or two after Maggie joined. By October 2023, the high volume of phone calls and emails from Principal Directors and Principals decreased significantly. Meetings with PDs had stopped. I previously met with the PDs weekly. We also would have impromptu meetings if needed. I met with PDs when no one else would meet with them. No one in HR met with them, I would take their issues and concerns with Employee Relations and/or Compensation to the other directors. I was completely baffled by how my interactions with PDs and Principals all came to a halt the way that it did. Why would these individuals who were really my peers (not my bosses' peers) not connect with me regularly? It just didn't make sense. Again, this was all very demeaning. Maggie would receive all requests no matter how small rather than the requests coming to me. I asked Maggie about this in a couple of my check-in meetings, as well as I emailed her my concerns, as the PDs were my peers (not hers... she was a Chief). She shared that it is required that staff include the chief and the director on all emails when requests were sent. This was not my experience all the time. My team would forward me emails that they were sent by the PD

and/or Principal. It included the recruiter or specialist and Maggie, but I was not on the email. Maggie also didn't bring these situations to my attention or forward them to me so I could be looped in. She would address the situation and move on. I asked her about this during multiple check-in meetings, and she responded yes, I want them to loop me in. I explained that it is fine. However, please encourage the sender to include me in the email as it was recruitment, staffing, substitute or licensure issue and allow me to address it. Through my last month there, I got fewer and fewer calls and/or email messages from leaders.

Maggie also worked to isolate me from my team. My team members were confused about whether or not to come to me as their director or to just seek direction from Maggie. Maggie would seek the assistance of one of the recruiters for compensation/offer questions she had. This individual happened to be one of the least experienced recruiters at the time. Why not bring these questions to me, as I am the most experienced member of the team and would be able to give her the appropriate answer, as well as a detailed understanding as to how the salaries were derived historically? This recruiter would come to me because she didn't want to make a mistake with the guidance she was providing Maggie. I spoke to Maggie about this. She questioned the recruiter as to why she told me about the compensation/salary situation that Maggie pulled her into. From that point, the recruiter stopped coming to me and would seek assistance from the Recruiting Manager instead. She shared that she didn't know what to do. She just didn't want to get into trouble. What in the world? How could the employee be criticized for going to her director? This type of behavior shows how Maggie would regularly throw her power around and intimidate staff.

34

In addition, I had been excluded from meetings that normally would include me as they would directly impact staffing. For example, there were a couple of meetings with Talent Ed regarding the applicant tracking system and the Director of Talent Acquisition was not included in the meeting. One of the HRIS specialists shared with the Recruiting Manager that there was a TalentEd meeting that had occurred. This employee shared with the Recruiting Manager that she was not supposed to know about the TalentEd meeting that occurred. It was shared that decisions had been made at that meeting, and she needed to meet with the team in my absence to confirm new statuses to be used. The recruiting manager explained that I had just left the office and had an appointment but would only be gone for a short period of time. She was told that it was imperative to have the meeting now. The team met without me. When I returned, the recruiting manager shared what had occurred and provided me with an email to document what happened (see attached). She also shared that they were required to make decisions on the statuses and had to report this back to Maggie. So again, my team was encouraged to make decisions without me under direction. Also, the vendor representative for this meeting also questioned why I wasn't a part of the meeting. He confirmed that the meeting occurred. He shared that there were a few people at the meeting. I was not included. He said he asked Maggie if everyone that she be included in the meeting was included. She said "yes". Again, how is this possible? Why would the Director of Talent Acquisition not be included in a meeting with the vendor for the applicant tracking system (ATS) and what our needs are for the system going forward?

Other situations that have occurred:

·        Maggie rarely talks to me at all.  We talk during the check-in meetings (once per week), Directors meeting or if I stop by her office.  She does not talk to me otherwise. This was very noticeable to me because she opened talked to some of my team members.  She would stop and engage in conversation in their offices or have loud conversations at the copier.  Maggie did not engage in conversation with me.  The interesting part about this is that our offices were right beside each other.  I would always hear her talking to people, but very infrequently did she talk to me.  Rather than bring situations to me in person, she would send me an email.  This is a tactic that leaders use to document an employee.  Anytime there was a topic that needed to be addressed to me, Maggie always chose to email me rather than have a face to face conversation with me.  Again, demoralizing and degrading behavior from this Chief.

·        Email responses to me are accusatory.  Usually, I would get emails to correct something that she says I've done.  Information is not completely accurate all the time. I've asked her to ask questions first rather than just going with what she heard from someone else.  The information is not always accurate.

·        Maggie also required that I needed to have her review my submittals or emails to leaders.  She had sent me emails to indicate that anything I wanted to share with staff needed to be reviewed by her first for approval.

○ In one of the blurbs that I was looking to submit to the School Leader Weekly newsletter, she sent me an email correcting my word choice and giving me an English lesson. It was very condescending.

○ In other conversations she has verbalized that she did not believe I had done research around a situation.

○ I told her that she did not come to me regarding request for tutors. I knew nothing about it. She disregarded what I said and restated that she brought this to me for posting. I did some digging and determined that Maggie had not communicated this to me. She actually took it to the Recruiting Manager. Maggie provided the Recruiting Manager with the instructions, and they posted the position. She still didn't believe me and never apologized. It made me look like I didn't know what I was doing in front of our customers. This was not a good look for the TA team or the Talent Office as a whole.

· I have no authority with my team and for things related to staffing, substitutes and licensure.

○ She is now requiring that I get approval for all job fairs or events that my team participates in.

○ MC has changed the swag items that we were seeking to purchase this hiring season. We wanted to purchase hand sanitizer spray. This item is always well

received at fairs. She sent me an email and said she had Mallory to change
that, as well as other items.

· More situations

○ At the end of October 2023, it was communicated to impacted teachers at
Redd Elementary that they would need to be leveled due to Class Size Reduction
exercises. I shared with Maggie the normal process and the history around this.
She disregarded what I communicated and decided to proceed using a process
that had not been previously communicated nor socialized with the board in
advanced. I was included in this exercise and communication to the impacted
staff and leadership team. It felt like I was pulled in to do the dirty work
because at this point, I had been eliminated and no longer included in many of
the leadership meetings. This process was a complete mess and should not
have happened the way that it did. Maggie was allowed to act without care,
concern and consideration for how leveling had been done for years. This is a
regular theme for this Chief of Talent. She does what she wants to do without
true thought in advance.

○ Working during the holidays... I was told that anyone who decided to do this
would need to work from an alternative RPS location. I shared this with my
team. The team wasn't happy about it, but they knew what they were going to
have to do. However, during our HR leadership meeting, when Maggie shared

this with team the HRIS Manager said "so does this mean we are able to work from home?" I was very surprised because I was told this was not an option. Maggie says out loud "no they can work from home; I just need to know and they need to track what they are working on home." Why the change from what she said to me the day before? Again, I was told something very differently for my team.

○ Maggie spoke poorly about me to one of the Recruiters. Questioned my thought process and why I didn't act when she thought I should've. She voiced her dismay to the employee (who in turn shared it with me) because she felt like she had gotten me in trouble. Situations like this were abundant. As with all the others it shows Maggie's unprofessional behavior as a leader and Chief of Talent.

All these things have made it very hard to continue working in this environment. It was a hostile work environment most days, which exacerbated my anxiety and overall mental health. My condition worsened the longer I continued to work under her. I tried to hang in there as long as I could, but once I saw my health declining and the panic attacks increasing, I chose ME. I love RPS and it is the district that I grew up in, therefore I had a vested interest in helping to improve the district. I could not remain in this environment, so I had to go on medical leave. The entire time I was on leave, Maggie did not reach out to me to check on me or see when I was returning. While out on leave, I found out the following things from my team:

·     Maggie never announced to the team that I was on leave for a period so the team or my peers could be aware. They had no idea what was going on with me.

·     Maggie took over my email address after two weeks of me being on leave. I was told by more than one person that she announced during the team meeting that she had access to my email box. This caused me to try to access my email and I could not access my email any longer. Maggie had changed my password.

> o I reached out to IT because I didn't think this was policy. I was told by IT that this is not normal practice. I was told that if I am considered an active employee, I would have access to email. This was not the case for me. However, I find it interesting that the other Directors have been out on leave and never had their email box taken over by their boss or anyone else. Why was this my experience?

> o Even the Chief of Talent prior to Maggie (Sandra Lee) was out on leave for a long period of time and her email was never taken over by the Superintendent. So again, why was it so important to do this to me, and not the Chief of Talent who was in a similar situation. Again, disparate treatment for similar situations

Also, I was always told that the practice within RPS was that when someone is on leave and their time is exhausted (week 12), hiring managers are not able to post the role until after 30 days following the exhaustion of the leave (week 16). Maggie was allowed to post the Director of Talent Acquisition position one or two days after my FMLA leave exhausted. No one

contacted me prior to doing so to determine if my plan was to return to the office or if I needed accommodation in order to return per my doctor's recommendation. The position was posted and filled within a little over a week. Someone was extended and accepted an offer for the role and that person left due to not being able to work under Maggie's direction. Absolutely amazing... how could this not get investigated... HOW? The superintendent and the school board should be penalized for allowing someone in a role such as Chief of Talent to function in this role for as long as she has without anyone investigating any of the claims that have been communicated. You should all be ashamed. This all started with me over a year ago. I reached out to board members prior to going out on leave and as well as while I was on leave without any action happening. Why? Are HR staff just not valued at all? You are willing to continue having people leave this department due to someone in the Chief of Talent role that is corrupt, unprofessional and grossly incompetent. HR in any organization is the foundation of the organization. Having this much horribly wrong with the Chief/ the leader of HR, will result in the demise of the entire school district. It will happen!

**Kristie Taylor Christian, Grants Accountant**

I started my role as a Senior Accountant in RPS in 2007, and I am writing to discuss some of the ways that the workplace culture issues in leadership have affected my work life and have created a culture riddled with bias issues, especially in regard to pay grade and decompression.

In regards to pay decompression, the current system is extremely biased and unethical. In my specific case, I am not an employee who was hired at the wrong step that decompression

was intended to address. I am the employee who has gone several years without a cost of living raise and whose salary hasn't kept up with inflation. It is unfair that I can't qualify for an actual pay raise until I meet my decompression amount that seems to be arbitrarily decided. To ensure the process was performed without bias, all decompressed employees should have been reviewed by multiple people to make sure their years of experience match their steps and that individuals' bias against certain people and groups was not affecting the decisions. In my experience, the decompression process has been biased against employees with postsecondary education, which is sad in an educational environment that promotes postsecondary education to its students. Employees with advanced education should receive years of experience for their allocated time in college (Four years degree = Four years' experience), which would level the playing field for employees with postsecondary education degrees.

Regarding pay grade, I have seen bias, especially against women of color, affect the way people are placed. In May of 2015, the Finance Department underwent a reorganization. During this reorganization, my position, along with other positions in the department, was downgraded or merged. In my case, my title was downgraded to "Staff Accountant" while my duties stayed the same. However, my male/white counterparts duties remained the same and his position was upgraded to "Financial Analyst". He strongly felt our positions (mainly his position as "Lead Accountant") was performing the same duties as the "Financial Analyst" and should be changed, and due to his close relationship with leadership at the time, the change was honored without question. Also, the supervisor/manager positions that merged in the original reorganization were later separated back out, restored and upgraded. This was a clear example

of leadership bias to certain select employees. Fast forward to June/July 2024. Decompression

happens, which I thought was the process to correct the wrongs of the past and it would be a

benefit to employees such as myself, working for years without a cost-of-living increase or

salary adjusted for inflation. Yet, this process benefited some (mostly highly paid individuals

such as directors) and harmed other long-term employees. Due to the decompression process,

an employee's compensation is directly related to their position grade and years of experience. I

asked to have my position restored to "Sr. Accountant" or upgraded to "Financial Analyst" and

was turned down. The reason given to me was because my duties haven't changed. When my

title was previously downgraded, my duties never changed. I was also informed that I could not

compare myself to my white counterparts because they do slightly different functions. We all

know the positions are similar in nature, and the 5% difference does not justify my position

being 4 grades below theirs. Emails below requesting my position reclass:

"Email to Wanda Payne on 07/4/24

I am requesting that my current title, Staff Accountant grade 119 be upgraded to the title of

Financial Analyst grade 123. This request is being made due to the fact that I am performing the

same job functions as other Financial Analysts currently working in the Finance and Grants

Compliance departments who are grade 123. I have worked in my current capacity for 17 years. I

hold a Bachelor's degree in Business Admin with a concentration in Finance, along with a

Master's degree in Vocational Education. I feel that it is only fair and equitable to upgrade my

position to match that of my coworkers who perform the exact same job duties working with

grants, some of whom only hold a high school diploma with no advanced degree(s). Based on

current hiring practices and pay grades, it appears that educational requirements are severely relaxed for certain demographics which are neither equitable nor just.

Response from Wanda Payne on 10/18/24

Kristie,

Your request for a reclassification was not supported. The scope and level of responsibilities of the Staff Accountant are not on the same level as the Finance Senior Accountant or Financial Analysts positions. In the Finance Department the Senior Accountant and Financial Analysts positions require assistance with the annual audits, to include the Single and/or Virginia Retirement System, and/or Financial audits and/or schedules and/or reports for the Single Audit and Annual Comprehensive Financial Report (ACFR). Examples include but are not limited to the Schedule of Expenditures of Federal Awards (SEFA) preparation and tie-out to the general ledger, Grant Life preparation and analysis, Zero Fund Balance preparation, adjustments and upload and other reconciliations. You have not performed nor do you have the responsibilities for such tasks.

However, I have recently been made aware that there is a compensation study underway. The committee is reviewing positions and salaries and the equity across roles. I have forwarded your request to Shareyna Chang with a request for a review by the committee."

**Shauntele Waller-Day, Licensure Specialist**

My name is Shauntele Waller-Day, I am a Licensure Specialist in the Talent Office. I have been dealing with intimidation and unfairness for over a year from Mrs. Clemmons. In May of last year, I was given a letter of concern regarding attendance, work performance, and responsiveness to emails. At the time, I was on intermittent FMLA. I reached out to ELR on May 1, 2024 and on May 6,2024 I met with Nakisha Winston briefly to discuss my issues. I did not feel confident with the end of this meeting because we are under the same leadership, and I was placed on a PIP in June of 2024. When I asked, I was told I was being placed on a PIP because I was not where I needed to be due to the timing in my position.

I have been in my position since March 16, 2021, and I briefly began training for this upcoming role as a Licensure Specialist a few days earlier on March 11 while I was still actively in my previous position as a Human Resource Associate. I continued to do work in both roles until they hired a replacement October 18, 2021, I was then asked to do my work as a Licensure specialist while also training my replacement Human Resource Associate. Once I was fully in my role as a Licensure specialist, the previous Sr. Licensure Specialist went on leave in March of 2022. This meant that I was without a Sr. Licensure Specialist to train me until January 17, 2023 and did not actually start training again with a Sr. Specialist until May 30, 2024. Once we started, we had training on Tuesday and Thursday for an hour. Since we started, we have been flexible with the timing of training due to things needing to be rescheduled, but the training has continued. In the time since starting this role, including the large gap in training, I have been trained by two different people with two very different teaching styles, which has also made this process extremely difficult. On top of my insufficient training, Mrs. Clemmons has changed the

system for reporting lapses in licensure and non- renewals. All the paperwork for non-renewals is handled by her and she is supposed to provide the correct paperwork and lists to various departments. She never informed me of the changes she made in this system, which has allowed staff's licensure and non-renewals because of these lapses in licensure to fall through the cracks. Despite not being given a fair opportunity to have comprehensive training with the correct information, it feels unfair that I am being put on a PIP for not meeting expectations for a role I have not been fully trained for. She has also made parts of my work extremely difficult to complete on time because I am left waiting for paperwork, specifically for non-renewal, from Mrs. Clemmon herself.

At the same time, I have been dealing with severe micromanagement and intimidation from Mrs. Clemmons. My other colleagues have much more flexible work schedules and the ability to come in early to work and then leave earlier. I have been told that my work schedule is from 8am-4:30pm with no flexibility. On top of that, I have also been told that I am only allowed to take a 30-minute lunch break while all of my colleagues are allowed to take an hour. Another specific example of her behavior is that one morning I had my office door closed because I was not in the best headspace and wanted to work in a quieter environment. Mrs. Clemmons came and knocked on my door and asked me why it was closed. When I told her why, she told me she was not sure if I arrived on time and assumed that I wasn't here on time since the door was closed. She then said that my door had to remain open, and I requested that she put that in writing. It was interesting that she said she did not know if I was at work because my door was closed since she has told me on multiple occasions that she monitors my badge scans. She

knows the exact times I am at work, and when I am not, so there is no room for her assumptions.

This has been the most toxic and divisive work environment I have ever encountered. Mrs. Clemmons has made it extremely difficult to try to stay calm at work and do my job properly due to the constant stress and strain on my health due to micromanagement.

**Pamela Whitaker, Accounts Payable Technician**

My concerns are with Linq and not having support or the tools to complete my assigned task. We are dealing with two individuals that did not know CIMS/ AS400 that we transitioned from to LINQ, a new system that they are just learning. When the LINQ's team came to Finance to troubleshoot and help Payroll and Accounts Payable,we were not able to talk with them about our issues and concerns. We have no one to stand up for us in Management. My concerns are overlooked and sometimes laughed at.

In Accounts Payable I have seen my white colleague get the opportunity to be reclassified and reassigned to different positions without the role being posted, which is against RPS policy. I have been with RPS in the Finance Department for 37 years. I have never received any opportunity such as this. What I have been told is "You need a degree". I feel overlooked and disregarded and have never received the opportunity or grace that my white counterpart is afforded.

**Shawmika Wright**

The following outlines my concerns regarding a salary offer extended to me for the Labor Relations Specialist position.

I have been an RPS employee since 2001 and ran across a job posting that piqued my interest based on the work I have done and the direction I desired my career to take. **The Labor Relations Specialist position was posted in April. I applied and went through the interview process in May. I was extended the offer at the end of May (5.29.24) and below are the outlined details of my offer:**

After receiving the offer from Sandra Lee, I was ecstatic and anticipating transitioning into my new role on June 18th; however, there were a few "*roadblocks*" that impacted me starting. I received the official offer from Mallory Miller via email on May 30th. Due to me having questions regarding the offer, she set-up a phone meeting with me on Tuesday, June 4th. She indicated, based on her schedule, this was the earliest availability she had. During the phone meeting, she clarified the salary compensation and the breakdown of transitioning from a Teacher Pay Scale to a Unified Pay Scale. In addition, she advised me to send her an updated resume to reflect the breakdown of my previous part-time and full-time work experience. In this revision, I also highlighted that my previous duties mirrored the Labor Relations Specialist position. I sent her the revised email the same day, **Tuesday, June 4th.** She acknowledged receipt of the updated resume on Wednesday, June 5th, and advised me she would review it that day.

After not hearing anything, I reached out to her on **Monday, June 10th** to inquire if I could assist with obtaining the necessary information to verify employment with NDUTIME?  During our phone meeting, I inquired if she needed any additional information other than my updated resume and she advised me all I needed to do was update my resume and other information would be verified at a later time.  However, she then advised she was having difficulty verifying the additional full-time NDUTIME experience.  Since it had been over a week, I offered, again, to assist in any way to solidify an updated offer.  Mallory shared "at this time, this offer is sitting with the Chief Talent Officer" and redirected me to Maggie Clemmons.

I reached out to Maggie on **Wednesday, June 12th** and indicated the following in my email to her:

*"After speaking with Mallory, I wanted to inquire how I can assist you with obtaining the necessary information to verify my full-time employment with NDUTIME?  When Mallory and I last spoke during a phone meeting, she advised me that all she needed was an updated resume that indicated my years of full-time employment.   She later followed-up with me and acknowledged receipt of my updated resume and advised me my information was with you and she was awaiting follow-up to confirm an updated offer.  However, I received an email from Mallory today indicating "**We were unable to verify the additional full-time experience you updated on your resume at NDUTIME; however, if you accept the role and you're able to get**

***those years verified the salary can be adjusted"***.  *When I inquired further and if I could assist with the verification, I was advised to reach out to you, directly."*

Maggie's responded on **Thursday, June 13th** with the following:

*My understanding from Mallory is that when she reached out to NDUTIME to verify your years of experience, the HR person she spoke to was not familiar with you and she asked for time to ask some other folks there. Mallory has since followed up via email and phone and no one has returned her messages. As Mallory shared, if we're able to get additional time verified, then we can adjust accordingly. The current offer reflects relevant work experience.*

*If you have additional questions, please let me know.*

I shared the following with Maggie after getting her response above:

*"Due to how much time had lapsed and still no updated offer, I called NDUTIME in follow-up to what I thought was a delay in my verification. However, I was advised the previous message left by Mallory was given to the Chief Executive Officer, Dr. Teshana Gipson, (the person who verifies employment of past employees). I was also informed that Dr. Gipson attempted to reach Mallory on a few occasions and never received a return call. I'm unsure who Mallory may have spoken to because I did not give her a contact person and if she called the main number, the personnel there would not be the HR person who can verify employment for past employees who worked for the agency prior to their employment. Therefore, the person who may have answered could not have provided Mallory the necessary information. Thus, I would have*

ensured she had the contact name of the appropriate person. To avoid any confusion and/or lapsed time during this process, I asked Mallory during our phone conversation if she needed any additional information from me to verify the years of experience and she advised me "no." However, it now seems that information would have been helpful prior to her contacting NDUTIME. Again, thank you for clarifying that the salary can be adjusted; however, if the necessary information can be provided beforehand, that seems like it will avoid the need to make any adjustments."

Maggie's responded on **Thursday, June 20th** with the following:

Good afternoon Shawmika and Happy Little Friday,

I apologize for the tardy delay.

Mallory and I touched base at the beginning of the week about her communication with NDUTIME. She reached out via email and phone to NDUTIME. She maintains that she did not receive any voicemails after her initial reachout, and the person she spoke to at NDUTIME did share that the message would be shared with their Director. It wasn't until after you had shared with Mallory that you had spoken to Ms. Gipson that she was able to connect with her. Mallory didn't need any additional information because she had the email and phone number and had reached out. It does sound like there might have been some missed connections, so I'm glad they were able to connect and verify that information.

*Mallory calculated 11 years of experience for you when she made the initial offer. She provided 1/2 credit for your years as a social worker as that experience was not directly relevant to human resources. Additional experience over that was not credited because it was either part-time/intern experience or it was not relevant. However, when reviewing the job description and knowing the nature of the work, I advised we give you full service credit for your social work experience and your added NDUTIME experience, so it would be calculated at Step 30 on the 2024-25 Unified Pay Schedule, which is $92,265. You would also receive the $576 Master's supplement.*

*Mallory is out of the office the rest of this week, so please consider this an offer made from the Talent Acquisition team on her behalf. Please let me know if you have additional questions.*

*Thank you again for your ongoing patience.*

My response **on June 20th:**

*Thanks for the follow-up and clarifying the missed connections.  Please know my additional questions/response is because I am trying to get a clear understanding in regards to this offer and how the calculations are computed.*

*In speaking with Mallory initially, she shared that my offer would be based off of the 2023-24 Unified Pay Schedule with giving me full service credit (which should be 23 years) for my years in RPS (**Grade 123 Step 22 which is $88,976 with a Master's Supplement of $576**).  This was*

*prior to the breakdown of my resume and updated employment verification.  During my phone conversation with Mallory, it was clarified the 24-25 Unified Pay Schedule would not be utilized to determine my offer due to my offer being prior to July 1.  Based on the 2023-24 Unified Pay Schedule, with my years of experience, **a Grade 123 Step 30 would be \$100,231**.  With that being said, how has this now changed and the updated offer with the verified experience is now computed off of the decompressed schedule (**Step 30 on the 2024-25 Unified Pay Schedule, is \$92,265. You would also receive the \$576 Master's supplement**)?*

*I appreciate you working on my behalf and on Mallory's behalf; therefore, it is my hope that this can be clarified by Monday, June 24th; especially since I have been trying to work this out for over two weeks.  Additionally, I am still more than willing and prepared to start prior to July 1.*

Maggie's responded on **Thursday, June 24th** with the following:

*Good morning,*

*I apologize for the confusion. The school board approved the 2024-25 unified pay schedule on May 20. Since your original offer occurred on May 30, you should have been offered on the 2024-25 scale. The original offer did not accurately reflect the schedule that would be used for the upcoming year, and I apologize that the original offer was based on outdated information.*

*Your current offer is Step 30 on the 2024-25 Unified Pay Schedule, which is \$92,265. You would also receive the \$576 Master's supplement.*

*Please let us know how you would like to proceed.*

**I asked to speak with Maggie via phone to avoid the lapsed time with emails and she advised she was very busy with other contract issues and would try to address any concerns or questions via email.**

**My Response to Maggie on July 1st:**

I am still puzzled how it can be justified to offer me a salary based on the new salary schedule (which is a decompressed schedule), when my offer was initially made during the 23-24 school year using the 23-24 schedule. Additionally, with the board voting on a new schedule in May, the effective date for that schedule is July 1, 2024 and it seems it would apply to offers made after that date; not when the board votes. If that was the case, it seems like every RPS employee would have received an adjusted salary on May 21st, after the board voted the night before. It is my understanding that, typically, changes of this magnitude have an effective date.

More importantly, I have been trying to negotiate my salary since May and I provided what I was asked to update the offer. However, it took longer than expected to get an update and I am still trying to secure my offer. Again, the initial schedule that was used to determine my initial offer should stand as the only change should have been the step, based on my years of experience. The salary schedule, to a schedule that is lower than what I was initially offered, should not be what is used to update my offer and this is very confusing and concerning. I have been anxiously waiting to embark on my new adventure; however, I have been unable to due to this obstacle.

Unfortunately, my concern was never resolved. Due to the aforementioned details and events, my transition to my new position was stressful, open-ended, and chaotic. There were so many unknowns and I felt my only option would be to accept the position to avoid missing the opportunity for advancement.

My questions/concerns are as follows:

1. Maggie indicated to me that my salary, if offered from the 23-24 schedule, would have been decompressed; however, I am well aware that several central office staff received a salary increase on their new contracts. In addition, if *the recruiter inadvertently used the incorrect scale (which seems inaccurate)*, initially, I should not be penalized by it not being honored; especially, since the job was posted and offered prior to the new unified schedule's effective date.

   a. Additionally, the salary range on the posting was reflective of the 23-24 salary schedule; therefore, how can an offer be adjusted to reflect a new schedule that is not effective until a later date?

2. Maggie also indicated *the intention for any new employee being offered a position on May 21 and beyond would go ahead and be offered what was on the FY25 unified pay scale so that they would be aligned with that scale when we*

*did the decompression work with current staff that would go into effect July 1.* Was this put in writing and communicated at the time the vote occurred? More importantly, if this is an intention rather than a practice or policy, it seems like it is more subjective and unwarranted and would be in practice for all positions. Additionally, how can Maggie account for what the intention of the board when it pertains to compensation?

2.    How is the position rank of "Sr. Specialist" determined vs. "Specialist?" *It was my understanding that all middle staff under the ELR managers would be identified as "Sr. Specialist," based on the responsibilities expected in the ELR department?*

3.    Since I have transitioned to the ELR department, I have yet to receive parking. I have had to make other arrangements for parking on a daily basis, which is a huge strain to effectively do my job. Utilizing the shuttle from the RAS building on Leigh Street is not a viable option. The nature of my job requires me to visit schools, buildings, and other offices throughout the district; therefore, having access to my own designated parking is crucial due to the need of me having to leave City Hall at various times during the workday.

4.    My supervisor informed Maggie that I was considering filing a grievance based on my salary offer and my parking concern. Her response, that evening after normal business hours, was to remove my access to the *Administration*

*Unit Proposals* document.   I was tasked with creating and managing this document; however, I was abruptly stripped of my access.

**Conclusion and Resolution**

At this point, you have read 57 pages of just some of our experiences in an extremely horrible and unethical work environment. We are not the only people in Central Office who feel the same way and work in fear, we were just the first ones to come forward and speak our truth. No one should ever have to experience even a fraction of the abusive, vindictive, racist and frankly illegal behaviors we have been experiencing for over a year. Enough is enough and it is time RPS owns up to its motto to "Teach, Lead, and Serve with Love." After careful and extensive discussion with each other, our colleagues, and REA, it is clear that Maggie Clemmons **needs** to be removed, not just as Chief of Talent, but from Richmond Public Schools. We are also demanding that proper accountability measures are put in place to hold the leadership of the Finance Department accountable, and those individuals go through proper training, including training in leadership and sensitivity.

We will be seeing you at the February 4th School Board meeting and hope you can look us in the eyes and show us the respect we have long deserved.

Respectfully,

Sherrie Brown

Alyson Davis

LaMeekia Evans

Lyndsey Gilliam

Jodi Granger

Marie Holmes

Letitia Lampley

Sandra Lee

Bernice Lewis

Shirley Maxwell

Helen Mickens-DeMena

Larue Pope

Van Shelton

Kristie Taylor Christian

Demetria Trent

Shauntele Waller-Day

Pamela Whitaker

Shawmika Wright