**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| **MAGGIE M. CLEMMONS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )    **Civil Action No.: 3:25-cv-724** |
| **CITY OF RICHMOND SCHOOL BOARD** | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**<u>DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR</u>**
**<u>MOTION TO DISMISS</u>**

Clemmons asks the Court to disregard existing precedent and instead adopt novel legal theories to impose liability on the RPS School Board, all nine members of the Board, and RPS Superintendent Jason Kamras for statements made by individual RPS employees during the public comment portion of the February 4, 2025, School Board meeting (the "February meeting"). For the reasons explained in Defendants' opening brief and detailed below, Clemmons fails to state a claim on each count in her Amended Complaint, and it should be dismissed in its entirety.

## I.    ARGUMENT

### A.  The Individual Defendants are Entitled to Qualified Immunity on Count I.

Clemmons contends that it is too early for the Court to resolve the question of whether the Individual Defendants are entitled to qualified immunity because further factual development is needed. *See* ECF No. 21, at 5. Clemmons is wrong. The Court can and should apply qualified immunity and dismiss the Individual Defendants now because (1) it is not clearly established that a public official can be held liable for false stigmatizing statements made by third parties under a liberty interest claim and (2) it is not clearly established whether a school board can

constitutionally prohibit public comment on personnel matters, and thus it is reasonable for an official to conclude that he or she cannot.

### 1.  The Court Must Resolve Qualified Immunity at the Earliest Possible Stage.

The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Raub v. Bowen*, 960 F. Supp. 2d 602, 608 (E.D. Va. Aug. 2, 2013) ("[T]he Court remains cognizant of the Supreme Court's admonition that qualified immunity should be addressed at the earliest possible stage."). This is "[b]ecause qualified immunity is an immunity from suit rather than a mere defense to liability." *See Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted). "The driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *See id.* (cleaned up); *see also Barrett v. PAE Gov. Srvs., Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) ("Until this threshold immunity question is resolved, discovery should not be allowed.").

Consistent with these principles, it is well established that courts can resolve qualified immunity at the motion to dismiss stage, so long as the issue does not turn on disputed facts. *See, e.g.*, *Briggs v. Waters*, 455 F. Supp. 2d 508, 519 (E.D. Va. 2006) (citing *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305 (4th Cir. 2006)) ("[I]t is appropriate to raise qualified immunity as a defense in a Rule 12(b)(6) motion."); *B.R. v. F.C.S.B.*, No. 1:19-cv-00917, 2020 WL 12435689, at *20 (E.D. Va. Mar. 10, 2020) (resolving qualified immunity defense on a motion to dismiss because it did not involve any dispute of fact); *Rice v. Scholastic Book Fairs, Inc.*, 579 F. Supp. 3d 786, 804 (E.D. Va. 2022) (resolving qualified immunity defense on a motion to dismiss).

Citing *Byers v. City of Richmond*, No. 3:23-cv-801, 2024 WL 4295232, at *13 (E.D. Va. Sept. 25, 2024), Clemmons urges the Court to delay resolution of qualified immunity until summary judgment. But Clemmons's reliance on *Byers* is misplaced. That case required further factual development to resolve the application of qualified immunity to plaintiff's excessive force and unlawful arrest claims. *See id.* The defendant officer had submitted body camera footage, and the Court declined to consider the footage or resolve factual disputes on a motion to dismiss and reserved the issue of qualified immunity for summary judgment. *See id.* at *14 n.24. That is not the situation we have here.

The Court need not resolve any factual disputes to determine the availability of qualified immunity to Clemmons's claims. No factual development is needed to decide whether the law is clearly established that a public official may be held liable for violating a plaintiff's liberty interests because third parties made public false stigmatizing statements about her. Similarly, whether reasonable School Board members would have known that changing a policy that previously prohibited public comment on personnel matters at School Board meetings would violate Clemmons's constitutional rights may be decided as a matter of law.

### 2. The Individual Defendants' Qualified Immunity Argument Does Not Depend on the Court Resolving Any Factual Disputes or Considering Any "New Facts."

Clemmons incorrectly asserts that the Individual Defendants have tried to introduce new facts that are not included in the Amended Complaint, and that those disputed facts preclude the Court's consideration of qualified immunity at this stage. *See* ECF No. 21, at 7. Those "new facts" are not facts, but rather legal arguments about the state of clearly established law. For example, Clemmons critiques the Individual Defendants' reference to an advisory opinion (the "OAG Opinion") from the Virginia Office of the Attorney General holding unconstitutional school board policies prohibiting public comment on personnel matters. *See id.* The Individual Defendants

provide the OAG Opinion in support of the position that "a reasonable official would not—and could not—have clearly known that failing to censor RPS employee speech was an unconstitutional act." *See* ECF No. 11, at 11. This is not a factual allegation. This is a recitation of the legal standard the Court must apply in determining whether the Individual Defendants are entitled to qualified immunity. *See Hall v. City of Newport News*, No. 4:09-cv-136, 2013 WL 12099360, at *3 (E.D. Va. Mar. 29, 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) ("A right is 'clearly established' if it would be clear to a reasonable offic[ial] that the alleged conduct violates that right.").

The Individual Defendants do not assert (for purposes of this motion), and the Court need not find, that they *actually relied* on the OAG Opinion in electing to change the public comment policy to grant qualified immunity. In fact, the Fourth Circuit "has consistently conducted an objective analysis of qualified immunity claims and stressed that an officer's subjective intent or beliefs play no role." *Cybernet, LLC v. David*, 954 F.3d 162, 169 (4th Cir. 2020) (internal quotation marks and citation omitted). The OAG Opinion is intended to inform that objective analysis of the state of the law.

Clemmons has failed to demonstrate that any dispute of fact (or need to further develop facts) precludes the Court's consideration of qualified immunity at the motion to dismiss stage. As explained below, the Individual Defendants are entitled to qualified immunity, as a matter of law, even under the facts as pled by Clemmons.

### 3. It is Not Clearly Established that a Public Official Can be Held Liable for False Stigmatizing Statements Made by Third Parties Under a Liberty Interest Claim.

Clemmons first argues that the law is clearly established that public officials cannot make false stigmatizing statements about their employees as part of their separation from employment. ECF No. 21, at 8.

4

There is precedent to support this contention. A public official cannot make a public false statement that places a stigma on an employee's reputation in connection with that employee's termination or demotion. *See Alexis v. Kamras*, No. 3:19-cv-00543, 2020 WL 7090120, at *11–12 (E.D. Va. Dec. 3, 2020). But that's not what Clemmons alleges. Indeed Clemmons admits that the Individual Defendants themselves did not make any public false stigmatizing statement in connection with the end of her employment. *See* ECF No. 21, at 15 ("[T]he Individual Defendants raise the unremarkable fact that none of them personally made a public announcement of the reasons that Clemmons's contract was not renewed.").

To get around this issue, Clemmons proposes a novel interpretation of legal precedents interpreting Fourteenth Amendment liberty interest claims. Clemmons claims that "established precedent easily put the Individual Defendants on notice in 2025 *that they could not allow*, under their auspices, the making of public false statements or false implications about one of their employees . . . without running afoul of the employee's Fourteenth Amendment rights." *See id.* at 9 (emphasis added). But Clemmons fails to cite a single case that supports the proposition that the Individual Defendants can be held liable simply for *permitting* public comments by third parties. Clemmons certainly fails to point the Court to sufficient authority that places the question "beyond debate" such that it defeats qualified immunity. *See Hall*, 2013 WL 12099360, at *5 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Nor does Clemmons cite a single case supporting her argument that Defendants were obligated to disregard the OAG Opinion's direction that the speakers had a First Amendment right to comment on their boss and their work environment.

In each of Clemmons's cited cases, public officials faced liability on a § 1983 liberty interest claim for false statements made directly by that official. For example, in *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 307–08 (4th Cir. 2006), the defendant

5

administrators were found liable for placing a "corrective action" label on the plaintiff's job reassignment and communicating that to the NCAA. In *Socol v. Albemarle County School Board*, 399 F. Supp. 3d 523, 542 (W.D. Va. 2019), the defendant was alleged to have made multiple statements to others indicating that the plaintiff's termination was due to "deliberate and egregious misuse of purchase cards." Finally, in *Flanagan v. Pittsylvania County, Virginia*, No. 7:19-cv-00413, 2020 WL 2754754, at *8 (W.D. Va. May 27, 2020), the defendant made public statements on Facebook accusing the plaintiff of being "corrupt." These cases do not support the proposition that a defendant can be held liable for violating a plaintiff's liberty interests based on statements made by a third party.

To defeat qualified immunity, the unlawfulness of a defendant's conduct must be "clearly established" at the time of the alleged deprivation of a plaintiff's constitutional rights. *See Barrett*, 975 F.3d at 428 (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). Unless the law is "sufficiently clear" such that "every reasonable official would understand that what he is doing is unlawful" a defendant is entitled to qualified immunity. *See id.* "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *See id.* This means that the legal principle is clearly dictated by controlling authority or a "robust consensus" of persuasive authority. *See id.* (reversing denial of qualified immunity based "on a single decision" that did not even confront "similar circumstances"). A legal principle is not clearly established when it is merely "suggested by then-existing precedent." *See id.* Rather, the precedent must be so clear that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* This is a context-specific analysis that considers whether the official's conduct is unlawful in the "particular circumstances before him." *See id.* ("The rule's

contours must be so well defined that it is clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.").

Clemmons presents a novel approach to holding public officials liable for violating an individual's liberty interests under § 1983, based on statements third parties made during a public comment section of a school board meeting. The precise contours of this approach and its potential for broadly expanding liability to public officials is undefined. Qualified immunity shields public officials from liability for constitutional violations based upon such novel legal theories. *High Peak Partners, LLC v. Bd. of Supvrs. of Prince George Cnty.*, No. 3:07-cv-757, 2008 WL 1733605, at *6 (E.D. Va. Apr. 14, 2008) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). Based on the lack of clearly established precedent supporting extending § 1983 liability under these facts, the Individual Defendants are entitled to qualified immunity.

### 4. It is Not Clearly Established Whether a School Board Can Constitutionally Prohibit Public Comment on Personnel Matters.

Clemmons also contends that the law is clearly established that "public officials are fully within their constitutional rights to prohibit speakers from making false public attacks on individuals at school board meetings." *See* ECF No. 21, at 8. Defendants do not dispute that the Fourth Circuit has upheld as constitutional school board policies prohibiting public comments that "are harassing or amount to a personal attack against any identifiable individual." *Davison v. Rose*, 19 F.4th 626, 636 (4th Cir. 2021); *see also Platt v. Mansfield*, No. 24-2182, 2025 WL 3703412, at *1 (4th Cir. Dec. 22, 2025) (upholding constitutionality of school board policy that "prohibit[ed] speakers from targeting, criticizing, or attacking individual students during the public-comment periods of its public meetings"). But that does not mean that the law is clearly established that

school officials *must* bar negative public comments that amount to personal attacks or that failure to do so violates the constitution.

The trouble is, Clemmons does not allege that the Defendants changed a policy—or ever had a policy to begin with—that prohibits public comments amounting to "personal attacks." Nor could she. Rather, Clemmons alleges that the School Board had a policy "that personnel matters involving school employees should not be discussed in open/public sessions of School Board meetings." *See* Am. Compl. ¶ 52 (ECF No. 9). Clemmons alleges that "the School Board deviated from its established practice" by allowing the RPS employees to speak at the February meeting. *See id.* ¶ 53. In other words, Clemmons makes clear that she bases her liberty interest claim on Defendants' decision to change a policy that prohibits public comment on personnel matters generally, not on public attacks.

As addressed more fully in Defendants' opening brief, the OAG Opinion directly addressed a School Board policy prohibiting public comments on personnel matters generally. *See* ECF No. 11, at 9–11. The OAG Opinion concluded that "the School Board may not constitutionally bar speakers from discussing personnel issues or identifying individual school employees or officials during public session." *See id.* at 3. Defendants acknowledge that this OAG Opinion predates *Davison*, but *Davison* does not disturb this conclusion.[1] The Fourth Circuit in *Davison* did not address a policy prohibiting public comment on personnel matters. Its focus was limited to the constitutionality of a policy prohibiting only "personal attacks." *See Davison*, 19 F.4th at 636.

---

[1] The OAG Opinion does state that prohibitions on "personal attacks" during public comment are not constitutionally permissible. *See* ECF No. 11-1, at 4. The Fourth Circuit clearly negates that conclusion in *Davison*, but *Davison* does not address or negate the OAG Opinion's conclusion that policies prohibiting public comment on personnel matters are unconstitutional.

So that leaves Clemmons with no binding authority supporting the proposition that the actual policy Defendants are alleged to have changed would be upheld as constitutional. She turns instead to a few nonbinding out-of-circuit cases. Clemmons relies on *Slinkard v. Independent School District No. 1 of Tulsa County*, No. 23-cv-354, 2025 WL 967554, at *8 (N.D. Okla. Mar. 31, 2025).[2] But the school board policy upheld as constitutional in that case was also not a general prohibition on discussion of personnel matters. Rather, the policy allowed public comment during a board meeting only with "prior approval." *See id.* The policy ultimately sought to exclude specific topics of public comment, which are far more specific than the RPS policy:

> An issue in a pending lawsuit, complaint, or investigation filed with an outside agency, wherein the District, employee(s) or the Board is a party; A pending grievance; A pending employee complaint filed with the District or an outside agency; A complaint against individual employee(s); An employee disciplinary action including suspension or termination; A pending pupil disciplinary action including suspension or appeal that may reach the Board.

*See id.*

Clemmons also relies on *McBreairty v. Miller*, No. 1:23-cv-00143, 2024 WL 2187436, at *1–2, *7 (D. Me. May 15, 2024), and *Pollak v. Wilson*, No. 22-8017, 2022 WL 17958787, at *7 (10th Cir. Dec. 27, 2022), which both address the constitutionality of prohibitions on discussing personnel matters during public comment. These nonbinding cases are a far cry from a "robust consensus of cases of persuasive authority" that place the constitutionality of the policy "beyond debate." *See Barrett*, 975 F.3d at 429; *Hall*, 2013 WL 12099360, at *5. This is particularly true

---

[2] Seeking to connect the dots from Oklahoma back to the Fourth Circuit, Clemmons claims that the court in *Slinkard* relied upon *Davison* to uphold the constitutionality of the "no personnel discussion" policies for public comment periods. This is an overstatement. *Slinkard* merely includes *Davison* in a string cite that supports the proposition that the policy at issue "is viewpoint neutral because it restricts the discussion of all issues for which there is a designated separate and distinct administrative or legal procedure to address issues or file grievances." *Id.* at *9.

where a collection of other persuasive cases have held the opposite, and those cases have been relied upon by the Virginia Office of the Attorney General to conclude that blanket prohibitions on public comment on personnel matters are unconstitutional. *See* ECF No. 11, at 9–11 (citing *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 732 (C.D. Cal. 1996); *Leventhal v. Vista Unified Sch. Dist.*, 973 F. Supp. 951, 958 (S.D. Cal. 1997)).

In determining the availability of qualified immunity, courts "do not require of . . . officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotation marks and citation omitted). Courts do not expect officials to "anticipate subsequent legal developments" or "know that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, '[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Keenan v. Ahern*, 524 F. Supp. 3d 472, 477 (E.D. Va. 2021) (quoting *al-Kidd*, 563 U.S. 731, 743 (2011)).

Clemmons seeks to impose a higher standard on public officials to anticipate new legal developments or analyze conflicting cases. Clemmons would require officials to analyze whether an opinion by the Virginia Office of the Attorney General was "on firm legal ground[,]" and cites to Fourth Circuit authority or only "two old non-binding, out-of-circuit, lower court cases." *See* ECF No. 21, at 12–13. Clemmons would have public officials be required to conduct legal research on Westlaw or Lexis to determine whether a source of legal authority "was on shaky ground as a

general matter" and "outdated" before obtaining the protections of qualified immunity for their official actions. *See id.* at 13. This is not the law.

"In the end, the lodestar for whether a right was clearly established is whether the law gave the officials fair warning that their conduct was unconstitutional." *Gilliam v. Sealey*, 932 F.3d 216, 236 (4th Cir. 2019) (internal quotation marks and citation omitted). Given the lack of controlling authority and the absence of a robust consensus of persuasive authority it is, at minimum, not clearly established that policies prohibiting public comment on personnel matters are constitutional. It would therefore be reasonable for a public official in Virginia to determine, based on the OAG Opinion, that such policies are unconstitutional and could not lawfully be maintained. *Cf. Wesby,* 583 U.S. at 68 (granting qualified immunity where "a reasonable offic[ial], looking at the entire legal landscape . . . could have interpreted the law as permitting the arrests . . . . There was no controlling case [on point]. Indeed, several precedents suggested the opposite.").

Given the state of the law on February 4, 2025, Defendants did not have fair warning that their decision to end the unconstitutional policy prohibiting public comment on personnel matters could instead morph into an unconstitutional act that violated Clemmons's rights.

**B.  The Amended Complaint Does Not Adequately Allege that Any Individual Defendant Acted Personally to Deprive Clemmons of Any Liberty Interest.**

Notwithstanding Clemmons's assertions to the contrary, the Amended Complaint does not adequately allege that each Individual Defendant acted personally in the deprivation of her rights. As explained previously, Clemmons admits that no Individual Defendant made a public announcement of the reasons that Clemmons's contract was not renewed. *See* ECF No. 21, at 15. This should end the matter. Clemmons has not pointed to any authority that supports extending liability under the Fourteenth Amendment to hold public officials personally responsible for violating an employee's liberty interests based on statements made by third parties.

Clemmons relies, in part, on *Casto v. Thompson*, No. 2:23-cv-00798, 2024 WL 4028033, at *5 (S.D. W.Va. Sept. 3, 2024), to support the sufficiency of her allegations of collective Board action, but this case is inapposite for a couple of reasons. First, the plaintiff's allegations were more specific than Clemmons's allegations. In *Casto* the plaintiff "name[d] both deputies, allege[d] that they both chased the Plaintiff on foot, and that both participated in having the dog attack the Plaintiff after he surrendered. In addition, the Plaintiff allege[d] that the spoliation of body camera footage was a joint effort meant to benefit both Defendants." *See id.* The court found that the plaintiff "sufficiently specified the Defendants' roles in the underlying incident." *See id.* In contrast, Clemmons has not included specific allegations against the majority of the Individual Defendants. All allegations are brought against the "School Board, as a unit." *See* Am. Compl. ¶ 3.

Second, the court in *Casto* only considered the sufficiency of the allegations to support the plaintiff's state tort claims, not the plaintiff's § 1983 claim. *See Casto*, 2024 WL 4028033, at *5. While Defendants acknowledge that § 1983 does not impose a heightened pleading standard, "liability [under § 1983] will only lie where it is affirmatively shown that the official charged *acted personally* in the deprivation of the plaintiffs' rights." *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017). For example, in *Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023), a *Bivens* action, the Court found the "general" allegations to be insufficient because the plaintiff repeatedly referred to the defendants collectively. The Court in *Langford* rejected the same argument Clemmons asserts here, that "repeated general references to 'Defendants' in his complaint are sufficient because [it] functions as a shorthand alternative to listing each Defendant by name." *See id.*

Finally, Clemmons's only theory of liability against Defendant Jason Kamras appears to be that he "deliberately chose not to stop the RPS employees from speaking at the meeting." *See* ECF No. 21, at 15. Clemmons does not anchor this assertion to any allegation in her Amended

Complaint. Clemmons only alleges that Kamras communicated the Board's decision to Clemmons and others. *See* Am. Compl. ¶ 73. She does not otherwise allege that Kamras was involved in or had any ability to affect the Board's decision to permit the RPS employees to speak. *Cf. Wilcox*, 877 F.3d at 170 (finding that plaintiff failed to sufficiently allege involvement by a prison chaplain whose only role was informing the plaintiff that another official had decided to cancel Rastafarian services). Clemmons's additional conclusory allegation that Defendant Shavonda Dixon-Fernandez "specifically authorized" "each of the speakers who defamed Clemmons" fares no better. Even after reviewing the YouTube video of the February meeting, as Clemmons suggests, it is clear that Dixon-Fernandez simply presides over the public comment portion of the board meeting after the Board Members had allegedly already made the "collective decision" to change the public comment policy. *See* ECF No. 21, at 15. The Court should therefore also dismiss Count I as to the Board Member Defendants and Kamras for failing to sufficiently allege that the individuals acted personally in the deprivation of Clemmons's constitutional rights.

## C. The School Board Cannot be Held Liable Under *Monell* Because the Change to the Public Comment Policy Did Not "Effectively Cause" Clemmons's Alleged Constitutional Violation.

The School Board may only be held liable under § 1983 if its official "policy or custom" was the "moving force" behind Clemmons's alleged constitutional violation. *See Monell v. Dept. of Social Srvs.*, 436 U.S. 658, 694 (1978). But the School Board's alleged "collective Board decision" to allow independent third-party speech at the February meeting cannot be considered the moving force behind Clemmons's alleged constitutional injury *See* Am. Compl. ¶ 72.

Clemmons mistakenly relies on the theory of "effective causation" set out in *Sales v. Grant*, 158 F.3d 768, 776–77 (4th Cir. 1998), to support her position that Defendants can be held liable for violating Clemmons's liberty interest based on the independent speech of third-party RPS

13

employees. "Under an effective causation theory, the requisite causal connection can be established . . . by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Gandy v. Robey*, 520 F. App'x 134, 141 (4th Cir. 2013). Effective causation "imposes liability not only for conduct that directly violates a right but for conduct that is the effective cause of another's *direct infliction* of the constitutional injury." *See Sales*, 158 F.3d at 776 (emphasis added). The Fourth Circuit has hesitated to extend this theory to new § 1983 contexts. *See Gandy*, 520 F. App'x at 141 (noting that the effective causation theory "strikes us as highly dubious in the excessive force context").

Clemmons twists the application of this theory. Effective causation holds liable an individual who did not inflict the constitutional injury but set in motion a series of acts by which others directly inflict the constitutional injury. *See id.* Here, the RPS employees who spoke at the board meeting did not themselves inflict any constitutional injury on Clemmons. While Clemmons alleges the individual speakers caused her reputational harm, she does not allege, nor could she, that they themselves violated Clemmons's liberty interest by making those statements in connection with terminating or demoting her. The individual speakers, of course, were not Clemmons's employer and had no authority over her employment status. A constitutional injury under the Fourteenth Amendment liberty interest framework requires both public comments that place a stigma on the plaintiff's reputation *and* that such comments be made in connection with an employer terminating or demoting the plaintiff. *See Alexis*, 2020 WL 7090120, at *11–12.

*Sales* itself provides a helpful comparison. In *Sales*, the plaintiff alleged that she was terminated from her position as assistant registrar based on her political affiliation. *See Sales*, 158 F.3d at 770. Her employment status was controlled by the registrar who, in turn, was appointed by the local electoral board. *See id.* at 771. The plaintiff brought suit against members of the local

electoral board alleging that they caused the newly-appointed registrar to terminate her. *See id.* The district court originally dismissed the claims because the registrar ultimately held responsibility for terminating the plaintiff's employment, not the electoral board. *See id.* The Fourth Circuit reversed, finding the members of the electoral board could be held liable because there was sufficient evidence that their conduct influenced the registrar's decision to terminate the plaintiff. *See id.* In *Sales*, the registrar herself inflicted direct constitutional injury on the plaintiff by terminating the plaintiff due to her political affiliation. *See id.* at 778–80. In contrast, here, the individual RPS employees are not alleged to have directly inflicted constitutional injury on Clemmons. The School Board therefore cannot be held liable for "effectively causing" the RPS employees to violate Clemmons's constitutional rights.

Finally, as Defendants have explained, the "policy" Clemmons alleges gives rise to the School Board's municipal liability is the constitutionally-permissible decision to allow public comment on personnel matters. Clemmons has not provided any authority holding that a School Board is constitutionally *required* to implement policies that prohibit public comment on personnel matters, or personal attacks on individuals, for that matter. The School Board's decision cannot as a matter of law constitute the unconstitutional "moving force" required for *Monell* liability. "[S]ome limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985). Indeed, "there must be an affirmative link between the policy and the particular constitutional violation alleged." *See id.*

### D. The RPS Employees' Public Statements Were Not Made in Connection with Clemmons's Termination or Demotion.

Finally, Clemmons acknowledges that she "must plausibly allege that the false statements made by RPS employees were published in such a way that they were adopted by RPS as the

reason for its decision not to renew her employment." ECF No. 21, at 18. Clemmons claims her allegations are sufficient because Defendants placed her on administrative leave after the February meeting, told the public (months later) Clemmons would not be returning to her role, and said "nothing publicly to rebut the false and defamatory statements it allowed to be made public . . . ." *See id.* (quoting Am. Compl. ¶ 96). Clemmons's allegations are revealing. Rather than holding Defendants liable for public statements they made, she faults Defendants for *not* making any public statements at all. She seeks to hold Defendants liable for public statements made by third parties, but she has not provided any analogous case where an official was found to have "adopted" allegedly stigmatizing statements made by a third party, simply by not publicly rebutting them.

Clemmons also contends that the nonrenewal of her employment gives rise to a liberty interest claim, even though it is not a termination or demotion. But the Supreme Court has recognized that "it would stretch the concept [of a liberty interest violation] too far to suggest that a person is deprived of liberty when [she] simply is not rehired in one job but remains as free as before to seek another." *Bishop v. Wood*, 426 U.S. 341, 348 (1976). Clemmons relies on *Sigmon v. Poe*, 564 F.2d 1093, 1096 (4th Cir. 1977) to support the position that the nonrenewal of a contract can give rise to a liberty interest claim if the stigmatizing statements "have effectively foreclosed her ability to seek future employment." *See* ECF No. 21, at 19. But in *Sigmon*, the Court only assumed, without deciding, that the plaintiff had alleged the elements necessary for a stigma claim and vacated the district court's judgment on other grounds. *See Sigmon*, 564 F.2d at 1096.[3] So Clemmons's reliance on *Sigmon* is misplaced.

_____

[3] Clemmons also relies on *Harmon v. Cumberland County Board of Education*, 186 F. Supp. 3d 500, 508 (E.D.N.C. 2016), but in that case the court found that the plaintiff "failed to allege a constitutionally protected liberty interest in her continued employment" related to the nonrenewal of a probationary teaching contract. The court found that "[a]llegations of unsatisfactory job performance or insubordination are not sufficiently stigmatizing to establish a deprivation of a

**E. Virginia Does Not Recognize a Claim for Aiding and Abetting Defamation.**

Clemmons admits that the Supreme Court of Virginia has never expressly recognized a claim for aiding and abetting a tort. *See* ECF No. 21, at 19. She urges this Court to pave the way for this new cause of action and find that the Supreme Court of Virginia would recognize it.

Clemmons cites a case from Maine, *Meridian Medical Systems, LLC v. Epix Therapeutics, Inc.*, 250 A.3d 122, 129 (Me. 2021), to support the proposition that claims for aiding and abetting a tort have "gained traction." *See* ECF No. 21, at 20. But *Meridian* discussed the increase in jurisdictions specifically recognizing claims for aiding and abetting breach of fiduciary duty, not defamation. *See Meridian*, 250 A.3d at 129 ("Generally speaking, recognition of an aiding and abetting basis for liability for a breach of fiduciary duty has gained traction in other jurisdictions.").

Virginia, however, has thus far been unpersuaded by the jurisdictions recognizing claims for aiding and abetting breach of fiduciary duty. *See Infinity Tech., LLC v. Burney*, No. 1:19-cv-01507, 2020 WL 6387378, at \*6 (E.D. Va. June 4, 2020) (citing *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 659–60 (2004)) ("[N]either the Supreme Court of Virginia nor the Virginia General Assembly has adopted an independent cause of action for aiding and abetting a tort . . . ."). While Virginia still refrains from recognizing one of the more widely-accepted aiding and abetting claims, it is unlikely the Supreme Court of Virginia would recognize the less common claim of aiding and abetting defamation. *See Keil v. Seth Corp.*, No. 3:21-cv-153, 2021 WL 5088242, at \*12 (E.D. Va. Nov. 2, 2021) ("[T]he Supreme Court of Virginia has neither expressly recognized nor expressly rejected aiding and abetting a breach of fiduciary action as a separate cause of action.").

---

liberty interest" even when the plaintiff alleged that statements "blemished her reputation and foreclosed her . . . ability to find work as a teacher." *See id.* (cleaned up).

Virginia's federal courts generally refrain from recognizing a separate claim for aiding and abetting a tort. *See id.* at *13 (collecting cases) (quoting *Bastable v. Musulu*, No. CL 08-1191, 2009 WL 7339887, at *3 (Va. Cir. July 8, 2009) (stating that "there is no modern authority which supports a claim for aiding and abetting a tortious action"). This Court should follow the same rationale and decline to recognize a new cause of action for aiding and abetting defamation before such a cause of action is properly created under Virginia law.[4]

### F. Clemmons's Defamation Claim Fails to Plead the Exact Words Spoken and Defendants are Protected Under the Fair Report Privilege.

Clemmons persists with the frivolous claim that Defendants directly defamed her simply by live-streaming the February meeting on YouTube. Clemmons admits that the Amended Complaint alleges that certain statements were spoken at the February meeting that were not, in fact, spoken. *See* ECF No. 21, at 24 n.15. Through briefing she has clarified that she "is not suing on those statements and is only suing on the verbal public statements made at the meeting itself." *See id.* Her complaint therefore fails to set forth "the exact words spoken or written" that are alleged to be defamatory. *Bennett v. Lundh*, 916 S.E.2d 356, 359 (Va. Ct. App. 2025). Contrary to Clemmons's assertion, a plaintiff is required to plead the exact words that are alleged to be defamatory in federal court, just as in state court. *See Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652 (2015) ("[C]ourts in the Eastern District of Virginia regularly cite the pleading

_____

[4] Clemmons asserts, in the alternative, that Virginia recognizes a claim for joint tortfeasor liability. Defendants have been unable to locate any Virginia case imposing joint torteasor liability for defamation claims, so just like Clemmons's aiding and abetting "claim" the Court should not recognize joint tortfeasor liability in this context. Moreover, as Clemmons acknowledges, to adequately plead joint tortfeasor liability, a plaintiff must allege that the defendant "benefits from" the tortious acts of another. *See* ECF No. 21, at 22 (citing *Alliance Tech. Grp., Inc. v. Achieve 1, LLC*, 2013 WL 143500, at *4 n.5 (E.D. Va. Aug. 19, 2024)). Clemmons contends that Defendants "benefitted from their participation by not facing further threats of action or harassment by those seeking to publicly defame Clemmons under the guise of the First Amendment." *See id.* at 23. But this allegation does not appear anywhere in the Amended Complaint.

standards of Virginia state law when they dismiss defamation cases for failure to plead exact words."); *Brackney v. Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 623 (2023) (noting that the pleading "must purport to give the exact words" that are alleged to be defamatory). Indeed, even through her brief Clemmons has only identified a non-exhaustive list of allegedly defamatory statements. *See* ECF No. 21, at 24 n.15. Clemmons's defamation claim should be dismissed for failure to adequately allege the exact words upon which she bases her claim.

And, as explained in Defendants' opening brief, Clemmons's defamation claims fail because the opinion statements the RPS employees made about the "hostile" and "toxic" work environment Clemmons created (as shown in the YouTube video) are not capable of being proven true or false and are therefore not actionable as defamation. *See* ECF No. 11, at 22–26 ("Where statements depend on a speaker's point of view and cannot be reasonably interpreted as stating actual facts about an individual, such statements are not actionable as defamation.").

Clemmons's defamation claim against the Defendants also fails because the Defendants' alleged republication of the YouTube video of the School Board meeting is protected by the fair report privilege. Clemmons contends that the fair report privilege is unavailable to Defendants because they are not members of the press, but Virginia has never limited fair report privilege to members of the media. Indeed, the privilege is not so narrow. It "protects the publication of accounts of public proceedings . . . despite their defamatory nature." *See Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC*, 821 F. App'x 234, 238 (4th Cir. 2020) (internal quotation marks omitted). The privilege only requires that the republication be "a fair and substantially correct statement of the transcript of the record." *See Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 485 (E.D. Va. 2018). Despite Clemmons's suggestion that resolution of the fair report privilege must be delayed until the factual records is developed, the Court may apply the privilege

as a matter of law when the facts are not in dispute and reasonable people could not differ as to whether the publication is a substantial departure from the record. *See id.* Clemmons does not and cannot credibly claim that the YouTube video of the entire February meeting constitutes a "substantial departure" from the public record. The Court should therefore dismiss Clemmons's defamation claims against the Individual Defendants.[5]

### G. Defendants Did Not Assume a Legal Duty to Clemmons.

Clemmons admits that her gross negligence claim is not based on any recognized legal duty. *See* ECF No. 21, at 31. Rather, she asserts only that the Individual Defendants assumed duties to her based on their actions. *See id.* Virginia law only recognizes assumption of duty to impose liability for physical harm caused, and Clemmons does not contest this. *See id.*; *see also* ECF No. 11, at 29 (quoting *Burns v. Gagnon*, 727 S.E.2d 634, 672 (Va. 2012)). And while Clemmons claims she has experienced some physical manifestations of emotional distress in this case, *see* ECF No. 21, at 31, those symptoms are not the type of physical harm routinely recognized as giving rise to liability for assumption of duty. *Cf. Burns*, 727 S.E.2d at 672–73 (physical harm from fight at school). Clemmons's claim for gross negligence must be dismissed.

## II. Conclusion

For these reasons, and those previously articulated by Defendants, the Court should grant Defendants' motion to dismiss and dismiss Clemmons's Amended Complaint in its entirety.

---

[5] Defendants incorporate and reassert their arguments that they are entitled to immunity from these defamation claims and attorney's fees under Virginia's anti-SLAPP statute, which is intended to protect defendants from "the chilling effect of meritless civil actions." *See* ECF No. 11, at 24–26.

Respectfully submitted,

By: /s/ J. Benjamin Rottenborn
J. Benjamin Rottenborn (VSB No. 84796)
Kristin B. Johnson (VSB No. 71115)
Jamie H. Wood (VSB No. 97297)
Woods Rogers Vandeventer Black PLC
10 South Jefferson Street, Suite 1800
Roanoke, Virginia 24011
Telephone: (540) 983-7600
Facsimile: (540) 983-7711
ben.rottenborn@woodsrogers.com
kristin.johnson@woodsrogers.com
jamie.wood@woodsrogers.com
*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 9, 2026, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notice to all counsel of record.

/s/ J. Benjamin Rottenborn
J. Benjamin Rottenborn
